**Ahmad FOSTER, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 49A04–9304–CR–158.

Court of Appeals of Indiana,
Fifth District.

May 9, 1994.

Transfer Denied Aug. 18, 1994.

---

338

David E. Cook, Samper Hawkins Atz & Cook, Indianapolis, for appellant.

Pamela Carter, Atty. Gen., Cynthia L. Ploughe, Deputy Atty. Gen., Office of Atty. Gen., Indianapolis, for appellee.

SHARPNACK, Chief Judge.

Ahmad Foster appeals from his convictions of felony murder, auto theft, carrying a handgun without a license, and criminal recklessness. We affirm.[1]

Foster raises four issues for our review which we restate and consolidate as:

1. whether the trial court erred in admitting evidence obtained through the execution of a search warrant at Foster's home; and

2. whether the trial court erred in admitting Foster's statement to police in which he confessed his guilt.

The facts most favorable to the judgments of conviction are as follows. At approximately 12:50 p.m., on December 1, 1990, Timothy Smeehuyzen was driving to the Hoosier Dome in Indianapolis, Indiana, when he no-

ticed two people engaged in a struggle on the southwest corner of 60th Street and College Avenue. Smeehuyzen observed Foster with a handgun attempting to take the purse of an elderly woman, Mildred Stanfield. Foster raised the gun and shot Stanfield in the chest. When Stanfield began to slump and fall to the ground, Foster took her purse and fled. Smeehuyzen quickly turned his car around to pursue Foster, and Foster shot at Smeehuyzen. Smeehuyzen continued his pursuit and observed Foster get into the passenger side of a late model Oldsmobile Calais. As the chase continued, Foster leaned out the passenger side of the car and again pointed his gun at Smeehuyzen. Smeehuyzen eventually lost sight of the vehicle.

At approximately 12:53 p.m., police officer James Fitzpatrick of the Indianapolis Police Department received a radio dispatch reporting "a purse grabbed with injury" at 60th and College. Record, p. 1038. Fitzpatrick then received a description of the vehicle in which Foster had fled and learned that Smeehuyzen was in pursuit of Foster. As Fitzpatrick drove through the course of the chase, he observed several items laying on the street and sidewalk, including a church organist's book and a black purse. Fitzpatrick directed a crime lab technician to the area to recover the items for evidence.

During the evening hours of that same day, the Calais used as the getaway vehicle was located, abandoned, on the northwest corner of 33rd and Carrollton. The car had been stolen just prior to the shooting and robbery. The owner of the car noted that the right rear vent window was broken out, the molding around the window had been pried, and the steering column was broken. The owner also noted that a baby car seat and Mobil Oil credit card were missing from the vehicle. The broken car window was covered by plastic held in place by tape, and several latent fingerprints were discovered on the tape.

On December 29, 1990, at approximately 3:30 a.m., fingerprints on the tape from the car window were identified as belonging to Foster's brother, William Foster. After as-

---

**1.** The parties presented their oral arguments to this court on March 15, 1994.

certaining William's address, police prepared a probable cause affidavit and a search warrant for his residence. The affidavit and warrant were taken to the residence of (the late) Judge A. Toni Cordingly, who signed the warrant authorizing the search. At approximately 10:00 a.m. that same morning, the police went to William's residence at 3046 North College Avenue to execute the search warrant. Foster was found in bed, and under the mattress was a a .25 caliber handgun. Suspected narcotics were discovered on top of a dresser and table in the same room. Foster's brother William was found in another bedroom, and the .22 caliber handgun that had been used to shoot Stanfield was found in that room. During the course of the search, the boys' mother, Thelma Foster, arrived at the residence.

Foster and his brother William were transported to the police station for questioning. Their mother was transported to the police station separately, and their father was later picked up at his workplace and brought to the police station. With the presence and agreement of his parents, Foster waived his rights and gave a recorded statement to police in which he admitted shooting Stanfield. A latent fingerprint on Stanfield's purse was identified later as belonging to Foster.

Foster was fourteen years old when Mildred Stanfield was murdered. On motion by the State, juvenile jurisdiction over the cause was waived to adult court. Prior to trial, Foster moved to suppress the evidence seized during the search of the Foster residence and his statements to police in which he confessed to shooting and robbing Stanfield. The trial court granted Foster's motions with regard to any pre-rights advisement and waiver statements, but denied Foster's motions in all other respects. After a trial by jury, Foster was convicted of felony murder, robbery, auto theft, carrying a handgun without a license, and criminal recklessness. The robbery count was merged with the felony murder count, and Foster received a sentence of fifty-three years.[2]

## I

■ The first issue Foster raises for our review is whether the trial court erred in admitting the evidence obtained through the search of Foster's home. Foster contends that the search warrant authorizing the seizure of this evidence was improper and illegal and not supported by probable cause. Foster points to a number of allegedly fatal defects in the probable cause affidavit and the warrant, detailed below. In response, the State argues that the warrant was valid and supported by probable cause. We agree with the State.

Indiana Code § 35–33–5–2 provides, in pertinent part:

"(a) Except as provided in section 8 [IC 35–33–5–8] of this chapter, no warrant for search or arrest shall be issued until there is filed with the judge an affidavit:

(1) Particularly describing:

(A) The house or place to be searched and the things to be searched for; or

(B) Particularly describing the person to be arrested;

(2) Alleging substantially the offense in relation thereto and that the affiant believes and has good cause to believe that:

(A) The things as are to be searched for are there concealed; or

(B) The person to be arrested committed the offense; and

(3) Setting forth the facts then in knowledge of the affiant or information based on hearsay, constituting the probable cause."

I.C. § 35–33–5–2(a); see also U.S. Const. amend. IV; Ind. Const. art. I, § 11. Police officers seeking a search warrant are not required to make a *prima facie* showing of criminal conduct, nor must they demonstrate that contraband will be found on the premises to be searched. "They need only show that there is a probability of criminal activity. When an affidavit contains such information, the issuing court may draw reasonable inferences therefrom and issue the warrant."

---

**2.** Foster was sentenced as follows: felony murder, fifty years; auto theft, three years concurrent; carrying a handgun without a license, one year concurrent; criminal recklessness, three years consecutive.

*Baker v. State* (1990), Ind., 562 N.E.2d 726, 728.

In the case of *Stabenow v. State* (1986), Ind.App., 495 N.E.2d 197, 200, this court discussed review of a magistrate's determination of probable cause as follows:

"[I]t is axiomatic that a court of review will 'not invalidate warrant[s] by interpreting affidavit[s] in a hypertechnical, rather than a commonsense, manner.' [citations omitted] We have previously discussed the analysis utilized to review a magistrate's determination of probable cause:

'While the quantity and nature of the constituent elements necessary to establish probable cause are inextricably related to each given set of facts, there are two basic questions pertinent to the determination of probable cause for a search under any set of facts: (1) *whether the particular items sought to be seized are sufficiently connected with criminal activity and (2) whether the items are to be found in a particular place.* If sufficient facts are presented so that a neutral and detached magistrate can make an affirmative response to these questions, probable cause may be presumed to exist thus making the issuance of the search warrant reasonable.'

[citations omitted]

Our review of the probable cause determination is limited to an examination of the same information that was before the magistrate when the warrant was issued."

*Id.* at 200 (emphasis in original); *see also Kail v. State* (1988), Ind.App., 528 N.E.2d 799, *trans. denied.* We accord great deference to a magistrate's determination of probable cause. *Bigler v. State* (1992), Ind.App., 602 N.E.2d 509, 514, *reh'g denied, trans. denied.* On appellate review, we simply ensure that the issuing judge or magistrate had a substantial basis for concluding that probable cause existed; we do not undertake a de novo determination of probable cause. *Id.* "Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the

preference to be accorded to warrants." *United States v. Ventresca* (1965), 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684; *Brooks v. State* (1988), Ind.App., 526 N.E.2d 1027, 1029. With these standards in mind, we now turn to the resolution of the present issue.

As noted above, when the latent fingerprints from the tape on the broken window of the stolen Calais were identified as those of William Foster, the police immediately prepared the probable cause affidavit and warrant. Omitting formal parts, the affidavit reads:

"Detective Craig Converse swears or affirms that he believes and has good cause to believe from my investigation I learned from reliable persons that the following facts and attending circumstances that: On 12–1–90 at about 12:50 p.m. Mildred E. Stanfield was a victim of a purse grab and criminal homicide. This occurred at the Corner [sic] of 60th and College Avenue. Witnesses to the incident described the suspect as a light skin young black male. Witnesses said that vehicle in which the suspect ran to was a white new model Oldsmobile Calais, very clean. During my investigation, I found a white 1990 Oldsmobile Calais vin 1g3n154wxlm759629 stolen 12–1–90 10:00 a.m. This vehicle was found in the 3300 block of North Carrollton Avenue. The vehicle had the column punched and the rear passenger window busted [sic] out. On the window was a clear tape used to tape the window. The tape was removed by David Zauner of the Crime Lab. Prints were hand searched by Patrolman Frank Welfler and Mike Petty. On 12–29–90, Welfer and Petty of latent prints found latent prints recovered from the tape matched those of William Alvin Foster gallery number J–7573. Foster lives at 3046 North College Avenue. The vehicle was stolen and recovered under case number 830022f. Also recovered from the vehicle were fur fibers found on the driver seat. At this time several items are missing from the vehicle. I request a Search Warrant be issued for the residence 3046 North College Avenue. Also for the person of William Alvin Foster.

On 12–01–90, a witness to the homicide chased the suspect vehicle several blocks. After the vehicle was found 3300 North Carrollton, the witness Tim Smeehuyzen identified the stolen Oldsmobile as the same one he chased from the homicide scene."

Record, p. 265. The warrant recites that a copy of the affidavit "is attached hereto and incorporated herein in all respects," and describes the property for which the police were searching as: "A GREY CHILDS CAR SEAT. A MOBIL CHARGE CARD. DARK FUR GARMENT. .22 CAL. HAND GUN [sic] AND AMMUNITION. CLEAR ADHESIVE TAPE." Record, p. 262.

 Foster argues that the probable cause affidavit is insufficient because it does not specify with certainty the items for which the police are searching and how those items are connected to the stolen car or the murder. The State counters by noting that the items sought by police are listed specifically in the warrant and that the issuing judge may make reasonable inferences from the information in the affidavit. Foster is correct that, standing alone, the affidavit does not satisfy the requirements of I.C. § 35–33–5–2 because it does not particularly describe "the things to be searched for." I.C. § 35–33–5–2(a)(1)(A). As noted by the State, however, the *warrant* particularly describes the items sought by police, and the affidavit and warrant were presented to Judge Cordingly at the same time. Thus, our initial inquiry is whether the affidavit and the warrant may be read together in the present case.

Our research on this question identified a number of cases, including two cases from Indiana, in which courts of review have read the affidavit and the warrant together where the warrant did not particularly describe the items sought by police but the affidavit did particularly describe those items.[3] Our research also identified cases where, as in the present case, the appellant challenged the validity of the warrant where the affidavit failed to describe the items to be searched for and seized by police, but the warrant did describe the objects of the search. *U.S. v. Seta* (6th Cir.Ct.App.1982), 669 F.2d 400 (affidavit was not fatally defective despite failure to identify the property to be seized where it made two references to marijuana and search warrant itself, presented to issuing judge at the same time as the affidavit, specified marijuana as the item to be seized); *State v. Woratzeck* (1981), 130 Ariz. 499, 637 P.2d 301 (magistrate was justified in finding probable cause for search of six items specified in search warrant but not specified in affidavit; affidavits are to be tested in common sense and realistic fashion), *reh'g denied, review denied.*[4] Taken together, these cases stand for the proposition that, using a common sense approach, the affidavit and the warrant may be read together where there is a sufficient relationship between the two documents to justify testing the sufficiency of one with some reference to the other.

 In the present case, we believe that there is a sufficient relationship between the

3. *Thompson v. State* (1993), Ind.App., 613 N.E.2d 461 (search warrant not invalid on its face for failure to list items to be searched for and seized where affidavit in support of warrant, affixed to and incorporated in the warrant, enumerated items sought; warrant and incorporated affidavit read together); *Mills v. State* (1978), 177 Ind. App. 432, 379 N.E.2d 1023 (search warrant not defective for failure to list items sought where affidavit copied in full into warrant and affidavit specified that warrant was sought for a search for heroin); *U.S. v. Womack* (U.S.App.D.C.1972), 509 F.2d 368 (warrant met specificity requirements where it incorporated by express reference affidavit attached thereto which specifically detailed the items to be seized), *cert. denied,* 422 U.S. 1022, 95 S.Ct. 2644, 45 L.Ed.2d 681 (1975); *People v. Slusher* (1992), Colo.App., 844 P.2d 1222 (warrant's facial invalidity for failure to specify items to be seized was cured by accompanying affidavit which did specify items to be seized), *cert. denied,* —— U.S. ——, 113 S.Ct. 3050, 125 L.Ed.2d 735 (1993); *Com. v. Bagley* (1991), 408 Pa.Super. 188, 596 A.2d 811 (warrant not invalid for failure to list specific items sought where affidavit was incorporated into and attached to warrant and affidavit was sufficiently specific), *appeal denied,* 531 Pa. 637, 611 A.2d 710, *cert. denied,* —— U.S. ——, 113 S.Ct. 606, 121 L.Ed.2d 541 (1992).

4. *See also Conn v. State* (1986), Ind.App., 496 N.E.2d 604 (where affidavit did not set forth the state and county, this did not constitute substantial noncompliance so as to render warrant invalid where state and county appeared twice on the warrant).

challenged affidavit and the warrant to justify reading the two documents together. Although the affidavit did not particularly describe the property to be seized, the warrant incorporated the affidavit in its entirety and specifically listed the items sought by police. The affidavit and the warrant were presented to Judge Cordingly at the same time. Judge Cordingly initialed the list of items sought by police with the initials "ATC" on the face of the warrant. Judge Cordingly's initials indicate awareness of the items for which police sought authority to search. Thus, we hold that in light of the strong relationship between the affidavit and the warrant, the two documents may be read together. We further hold that the failure of the affidavit to particularly describe the items sought by police does not render the search illegal because the warrant itself particularly described the objects of the search. We believe that this holding is consistent with a common sense approach to reviewing Judge Cordingly's determination of probable cause and with avoiding a hypertechnical review of the sufficiency of the affidavit. *See Stabenow,* 495 N.E.2d at 200; *Thompson,* 613 N.E.2d at 465; and *Woratzeck,* 637 P.2d at 303.

We turn next to Foster's remaining arguments in support of his position that the search warrant was improper and illegal and not supported by probable cause.

■ Foster contends that "a fair reading" of the affidavit "had to leave the magistrate wondering for what offense [police were] searching William Foster's home." Appellant's brief, p. 20. We disagree. A fair reading of the affidavit reveals that the search pertained to the offenses of murder, robbery, and auto theft. Indiana Code § 35–33–5–2(a) requires that the affidavit allege "substantially" the offense to which the search is related. The affidavit before us satisfies this requirement.

■ Foster contends that the affidavit is insufficient because it is silent as to facts which connect the items sought by police to criminal activity. Foster also specifically asserts that the affidavit is insufficient because it does not specify the "manner" of Mildred Stanfield's death (*e.g.,* stabbing, suffocation,

etc.). He argues that the failure to specify the manner of death means that the affidavit does not support authorizing a search for a .22 caliber handgun.

The affidavit specifically identifies the car, connects the car to the murder and robbery of Stanfield at 12:50 p.m., notes that the car was stolen a few hours before the murder and robbery, and connects William Foster to the car through his fingerprints. The affidavit describes the location of the murder and robbery, the location of the abandoned car, and William Foster's address. The affidavit also notes that fur fibers were found and recovered in the driver's seat of the car, and that "several items" were missing from the vehicle.

■ As noted above, a judge or magistrate reviewing an application for a search warrant may make reasonable inferences from the facts presented in the affidavit. *Baker,* 562 N.E.2d at 728. We conclude that the facts found in the affidavit, together with the reasonable inferences to be drawn therefrom, sufficiently connect the items sought by police to the criminal activity described in the affidavit and provided a substantial basis for Judge Cordingly's determination of probable cause. The search for the child's car seat and the Mobil Oil charge card, items logically associated with an automobile, was supported by the statement that several items were missing from the recovered car. The search for a dark fur garment was supported by the statement that fur fibers were found on the driver's seat. The search for clear adhesive tape was supported by the statement that clear tape was used to tape the broken car window, and that William Foster's fingerprints were identified on that tape. Finally, the search for the .22 caliber handgun and ammunition was supported by the statement that Stanfield was a victim of a purse grab and "criminal homicide," as well as the reasonable inferences to be drawn from the affidavit taken as a whole. It was logical for Judge Cordingly to conclude that in addition to evidence corroborating William Foster's connection to the stolen car, the police sought authority to search for the weapon used in the robbery and homicide of Stan-

field. The sufficiency of a probable cause affidavit "need not rest on a single piece of information, but in the way the pieces fit together." *Utley v. State* (1992), Ind., 589 N.E.2d 232, 236, *cert. denied,* — U.S. —, 113 S.Ct. 991, 122 L.Ed.2d 142 (1993). Although, as the State concedes, the affidavit could have been more artfully drawn, the affidavit and warrant sufficiently connected the items sought by police to the subject criminal activity.

Next, Foster argues that the affidavit does not make any time connection between the recovery of the car and Stanfield's murder and that, as a result, Judge Cordingly was without any information to determine the question of staleness. Foster also asserts that the affidavit is silent as to facts that would allow the conclusion that the items sought would be found at the Foster residence "at so remote a point in time from the commission of the crime." Appellant's brief, pp. 19–20. As noted by our supreme court, "[t]he general rule is that stale information cannot support a finding of probable cause. Stale information only gives rise to a mere suspicion and not a reasonable belief, especially when the items to be obtained in a search are easily concealed and moved." *Raymer v. State* (1985), Ind., 482 N.E.2d 253, 255. There is no precise rule, however, as to how much time can intervene between the obtaining of facts and the issuance of the search warrant. *Id.*

We disagree with Foster's contention that the affidavit was silent as to facts that would allow a determination of staleness. At a minimum, it can be inferred from the affidavit that the car was recovered during the period between December 1, 1990 (the date of the subject crimes) and December 29, 1990 (the date of identification of the fingerprints). Additionally, although Foster correctly notes that the affidavit does not specify when the car was "reported" stolen, the affidavit does specify that the car was "stolen 12–1–90 10:00 a.m." Further, the affidavit specifically states that William Foster's fingerprints were identified on December 29, 1990, the same day the affidavit and warrant were presented to Judge Cordingly.

Foster urges us to rule that because more than three days elapsed between the December 1, 1990 murder and robbery of Stanfield and the issuance of the warrant on December 29, 1990, the information contained in the affidavit was fatally stale. We are not reviewing a probable cause determination connected to a search for controlled substances, however, which can be expected to be consumed or distributed in the commercial market "in the natural course of events." *Williams v. State* (1981), Ind., 426 N.E.2d 662, 667. Instead, the items sought by police in this case were in part innocuous (child's car seat, dark fur garment, and adhesive tape) and in part the sort of property that the perpetrator reasonably could be expected to keep (Mobil Oil charge card, handgun, and ammunition). In *Williams,* the supreme court held that the information supporting a warrant was not fatally stale where the police sought "the burned remnants of a purse and its contents, ashes or sludge," items which would have an innocent appearance and no utility, even though the subject shooting and robbery occurred on March 6, 1979, and the warrant did not issue until on or about May 12, 1979. *Id.* at 667. Likewise, in *Bigler, supra,* this court held that information contained in an affidavit was not fatally stale despite the passage of twenty-one days between the last known act of distribution of controlled substances and the issuance of the warrant where the officers sought evidence that would prove distribution rather than the controlled substances themselves. 602 N.E.2d at 516. Finally, although it is true that the shooting and robbery occurred twenty-eight days prior to the issuance of the warrant, the latent fingerprints found on the car were not identified until the early morning hours of December 29, 1990. Police immediately began preparation of the affidavit and warrant, the warrant was signed at 9:22 a.m. that same morning, and executed by police some forty minutes later. "An affidavit based on information only hours old is not defective for staleness." *Guajardo v. State* (1986), Ind., 496 N.E.2d 1300, 1304. For all of the foregoing reasons, Foster's contention that the affidavit contained fatally stale information is without merit.

Finally, Foster argues that the evidence obtained through the search of the Foster residence should have been suppressed because the search warrant did not authorize a search of the person of William Foster, and because neither the affidavit nor the search warrant make mention of Foster himself. We disagree. The police obtained a warrant authorizing a search of particular premises for particular items and they conducted their search accordingly.

The trial court did not err in admitting the evidence obtained through the search of the Foster residence.

## II

The next issue presented for our review is whether the trial court erred in admitting into evidence Foster's formal, post-*Miranda* warnings statement to police in which he confessed his guilt. Foster makes three separate arguments to support his contention that the trial court erred. We will address each of these arguments in turn.

First, Foster contends that his statement should have been suppressed because it was made subsequent to an illegal detention and arrest. Foster argues that his arrest and detention were illegal because the police entered the Foster residence with an illegal search warrant that did not mention him. Having already determined that the search warrant was valid, we will address Foster's remaining arguments that his arrest and detention were illegal.

Foster asserts that his arrest was merely a ruse to detain and question him in connection with the murder investigation and that there was no probable cause to support the warrantless arrest. The State responds by noting that a warrantless arrest is permissible if a misdemeanor is committed in the officer's presence or, if at the time of the arrest, the officer has probable cause to believe that the defendant has committed a felony. *Chandler v. State* (1991), Ind., 581 N.E.2d 1233, 1238; *Cornett v. State* (1989), Ind., 536 N.E.2d 501, 504. "Probable cause exists when at the time of the arrest the officer has knowledge of facts and circumstances which would warrant a man of rea-

sonable caution and prudence to believe the defendant committed the criminal act in question." *Battle v. State* (1981), 275 Ind. 70, 415 N.E.2d 39, 42; *see also Sanchez v. State* (1971), 256 Ind. 140, 267 N.E.2d 374. In the present case, the officers had knowledge of Foster's criminal history, found a handgun under the mattress on which he had been laying, and found suspected marijuana and suspected cocaine on top of a dresser and table in the room in which Foster was in bed.

Foster cites the case of *Snellgrove v. State* (1991), Ind., 569 N.E.2d 337, in support of his contention that his warrantless arrest was illegal. In *Snellgrove*, police officers monitored conversations between an informant and the appellant. After the informant left the appellant's home, the informant and the police discussed events for approximately thirty minutes and the police determined that they had probable cause to make an arrest. Police officers went to appellant's home and arrested the appellant. The police had no arrest or search warrant. *Id.* at 338–39. The Indiana Supreme Court ruled that although the officers had probable cause for an arrest, the warrantless arrest of the appellant in his home was improper; there were no exigent circumstances to justify the absence of a warrant. *Id.* at 340. In the present case, the investigating officers obtained a valid search warrant for a search of the Foster residence. Only William Foster had been linked to the getaway vehicle, and probable cause for the detention of Foster arose during the course of the search. Although officers investigating the Stanfield murder had hypothesized that a tight-knit group was involved in the murder, the probable cause for taking Foster into custody arose from the discovery of the handgun, suspected marijuana, and suspected cocaine. *Snellgrove*, therefore, may be distinguished from the present case.

With regard to Foster's contention that his arrest was merely a ruse to detain him in connection with the homicide investigation, the case of *Cornett v. State, supra,* is instructive. In *Cornett*, police were investigating a robbery. After a description of the perpetrator had been broadcast, a restaurant employee called police to report that a man match-

ing the description was in the restaurant. 536 N.E.2d at 504. Police went to the restaurant and sat in a booth. Cornett turned around and looked nervously at police several times. When Cornett got up to leave, police apprehended him because he fit the description of the robber. They found a large sum of cash on him and observed that he was intoxicated. The police arrested him and charged him with public intoxication. *Id.* He was later charged with and convicted of robbery as a class B felony. *Id.* at 503. On appeal, Cornett argued that the circumstances did not justify his warrantless arrest, therefore evidence resulting from the arrest should have been suppressed. *Id.* at 504. The Indiana Supreme Court held that the warrantless arrest for public intoxication was lawful and supported by probable cause. *Id.* at 505. Thus, the fact that the officers believed Cornett might be the robber did not detract from the probable cause the officers had to arrest him for public intoxication.

We conclude, therefore, that Foster's statement to police was not the product of an unlawful detention and arrest.

Second, Foster contends that his formal, post-*Miranda* warnings statement to police should not have been admitted because he was not advised of his *Miranda* rights or given an opportunity for a meaningful consultation with his parents prior to making admissions.

▆▆▆▆▆ Indiana Code § 31–6–7–3 provides, in pertinent part:

"(a) Any rights guaranteed to the child under the Constitution of the United States, the Constitution of Indiana, or any other law may be waived only:

(1) By counsel retained or appointed to represent the child, if the child knowingly and voluntarily joins with the waiver; or

(2) By the child's custodial parent, guardian, custodian, or guardian ad litem if:

(A) That person knowingly and voluntarily waives the right;

(B) That person has no interest adverse to the child;

(C) Meaningful consultation has occurred between that person and the child; and

(D) The child knowingly and voluntarily joins with the waiver."

I.C. § 31–6–7–3(a). The "meaningful consultation" requirement of the statute is "a matter peculiar to juvenile waivers; it is a safeguard *additional* to those requirements common to adult waivers—that they be knowingly, voluntarily, and intelligently made." *Williams v. State* (1982), Ind., 433 N.E.2d 769, 772 (emphasis in original). The meaningful consultation requirement may be satisfied by "actual consultation of a meaningful nature or by the express opportunity for such consultation, which is then forsaken in the presence of the proper authority by the juvenile, so long as the juvenile knowingly and voluntarily waives his constitutional rights." *Id.* The State bears the "heavy burden" of proving that the meaningful consultation requirement has been met. *Id.* Strict compliance with I.C. § 31–6–7–3 is required to safeguard the rights of juveniles. *Deckard v. State* (1981), Ind.App., 425 N.E.2d 256, 257.

The Indiana Supreme Court set forth the applicable standard of review where the admissibility of a confession is at issue as follows:

"The admissibility of a confession ultimately depends upon questions of fact which are to be resolved by the trial court. This being so, the standard for appellate review of waiver of rights or admissibility of a confession are the same as any other fact finding issue. *Chandler v. State* (1981), 275 Ind. 624, 631, 419 N.E.2d 142, 147. If the evidence is conflicting, only that evidence which tends to support the trial court's ruling will be considered on appeal. If the trial court's ruling is supported by substantial evidence of probative value it will not be disturbed. It is for the trier of fact to resolve conflicts on the voluntariness of the confession, and the reviewing court is bound by the trial court's resolution. The same is true of a waiver of rights. [Citations omitted] The execution of a waiver form is not conclusive. It is simply one factor for the trial court to

weigh in considering the voluntariness of a statement."

*Coleman v. State* (1986), Ind., 490 N.E.2d 711, 712–13.

When Thelma Foster arrived at home on the morning of December 29, 1990, her sons were in the back seats of separate patrol cars, and the police were continuing their search of the residence. Detective Converse explained to Ms. Foster that the boys were going downtown for questioning, that he needed her permission to talk with them, and that he would give her additional details on the way downtown. Ms. Foster called the boys' father, Wali Karim, at work; Converse also spoke with Karim. Converse asked Karim to come downtown, to which Karim responded that he could get off work at 3:00 p.m. and come downtown then if the police could send a car to pick him up. Converse transported Ms. Foster downtown and during the ride he discussed the investigation with her, including the identification of William's fingerprints, the items recovered from the residence, and his belief that one or more of her other sons also were involved. Ms. Foster arrived downtown with Converse at approximately 12:00 p.m. The boys were placed in separate interview rooms, and Ms. Foster was allowed access to both of her sons. At the request of Ms. Foster, no interrogation of the boys occurred, pending the arrival of their father.

At approximately 4:00 p.m., Karim arrived. Converse informed Karim of the details of the investigation and told Karim that he wanted his cooperation in talking to his sons, specifically indicating that he needed to hear William's side of the story. Karim, accompanied by Ms. Foster, went into the interview room to talk with William. Karim then informed Converse that William had something to say. Converse joined both parents in William's interview room, and William informed Converse that his brothers Anthony and Ahmad were in a car with him and that Ahmad had taken a woman's purse and shot her. Converse brought Foster into the same interview room; when informed of William's statement, Foster confirmed his participation in the robbery and shooting. After the boys made these admissions, Converse advised each of the boys and their parents of their constitutional rights and presented a written rights advisement and waiver of rights form for each boy. Converse made a separate oral rights advisement for each boy, and then informed the parents that they were entitled to a conference. Converse then left the room, informing the family that they should take as much time as they needed. The family's consultation lasted approximately forty-five minutes. Converse then repeated the rights advisement on videotape just prior to William giving his formal, taped statement, and the rights waiver portion of the form was signed by William and his parents on videotape. After William had completed his statement, the same procedure was followed with respect to Foster, who also made a formal statement. During the motion to suppress hearing, Karim confirmed that he was familiar with juvenile waiver of rights forms through prior experiences with both Foster and William. The trial court granted Foster's motion to suppress statement as to any pre-advisement and waiver statements, but denied the motion as to the post-advisement and waiver confession.

From the facts recited above, we conclude that the State met its burden in proving that the meaningful consultation requirement of I.C. § 31–6–7–3(a) had been met. While waiting for Karim to arrive downtown, Ms. Foster had access to each of her sons. After both boys and the parents had received their rights advisements, they were told that they were entitled to a consultation and that they should take as much time as they needed. The rights waivers were executed only after a forty-five minute family consultation. Thus, Foster was not only afforded an opportunity for a meaningful consultation, an actual consultation transpired. Accordingly, we find no error in this regard. Foster further contends, however, that the formal, post-*Miranda* warnings statement was tainted by the prior unwarned admissions and that there was little incentive not to cooperate on videotape after the "gut" admissions had been made. The State points to case law in support of its position that the formal, post-*Miranda* warnings statement was admissible notwithstanding the inadmis-

sibility of the unwarned admissions. *See Oregon v. Elstad* (1985), 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222; *Lyons v. State* (1987), Ind.App., 503 N.E.2d 928; *Butler v. State* (1985), Ind.App., 478 N.E.2d 126, *reh'g denied.* In *Lyons,* this court quoted with approval from the Supreme Court's *Elstad* decision: ˙

> " 'It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.
>
> * * * * * *
>
> We must conclude that, absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement. In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights.' "

*Lyons,* 503 N.E.2d at 930–31 (quoting *Oregon v. Elstad* (1985), 470 U.S. at 310–15, 105 S.Ct. at 1293–96). In the present case, we find no evidence of deliberately coercive or improper tactics. We conclude that although inadmissible at trial, the unwarned admissions were voluntarily made. Therefore, the unwarned admissions did not render the formal, post-*Miranda* warnings statement inadmissible.

Finally, Foster contends that the trial court erred in admitting his formal statement because the statement was coerced by improper and illegal police conduct. Specifically, he contends that: (1) Converse manipulated events at the Foster residence in order to solicit Ms. Foster's cooperation in having her sons speak with police; (2) Converse intentionally misled Ms. Foster to believe that her failure to convince her sons to cooperate with police could lead to the death penalty being filed against William Foster; (3) Converse represented to Foster's father, Karim, that Foster's case would stay in juvenile court; and (4) Converse imposed time pressures on the family in order to gain the statements. In essence, Foster contends that his formal, videotaped statement was not made voluntarily.

■ "Before a confession may be admitted into evidence at trial, the state must establish beyond a reasonable doubt that the defendant voluntarily and intelligently waived his rights to an attorney and not to incriminate himself." *Nichols v. State* (1989), Ind.App., 542 N.E.2d 572, 574.

> "The admissibility of a statement or confession is determined from the totality of the circumstances; and, whether the confession was given voluntarily and not through inducement, violence, threats, or other improper influences which would have overcome the free will of the accused. [citation omitted] On review of the denial of a motion to suppress a confession and the subsequent admission of the confession into evidence, we will not reweigh the evidence or reassess the credibility of witnesses. [citation omitted] The question of voluntariness is one for the trial court; we will not disturb the trial court's ruling when it is supported by substantial evidence of probative value, even though it may be conflicting."

*Nichols,* 542 N.E.2d at 574.

■ The facts most favorable to the trial court's determination that Foster's formal statement was admissible reveal that Converse offered Ms. Foster a ride downtown to speak with her in private about the details of the investigation; Converse did not require Ms. Foster to ride with him. Converse testified that during his conversation with Ms. Foster, she went through stages in her re-

sponse. She was at first indignant because the police had entered her home; her next response was one of disbelief. Converse informed Ms. Foster of the murder and asked for her cooperation. Ms. Foster informed Converse that William could not have been involved because he was with her. At this point, Converse wanted to impress upon her the seriousness of the crimes, and noted that she could be mistaken about William being with her on December 1, 1990. He indicated his belief that William and possibly another brother were involved. Converse indicated that this was a very serious crime, described the woman at the bus stop, and stated that similar cases have been capital cases. This was the only time that Converse made any such reference to capital cases. On December 29, 1990, when Converse made this statement, William was sixteen years old; Converse believed that he was also sixteen years old on the day of the crimes, December 1, 1990, and therefore qualified for the death penalty. *See* Ind.Code § 35–50–2–3(b). In fact, William was fifteen years old on December 1, 1990 and had turned sixteen on December 25, 1990.

In support of his contention that Converse intentionally misled Ms. Foster, Foster points to the following colloquy between defense counsel and Converse at the hearing on the motion to suppress:

· "Q. And did you tell her that her sons could be charged with adult murder?

A. ....and about the seriousness of the case. I never, I never told her this would be a capital case with William. I impressed upon her the seriousness of the case, which, I, I think I was able to.

Q. But, you didn't mention what charges they could be?

A. I didn't mention what charges, that is correct.

Q. But you did mention the word capital case once?

A. I did use the word capital once, yes.

Q. What did you say, specifically?

A. I said this is very serious. There have been cases like this that have been capital cases and that, I left it at that.

Q. So did you imply that if she didn't cooperate they could be charged with capital offense [sic]?

A. Uh, she could have reached that determination. I'm sure [she] could have, yes.

Q. Did you want her to?

A. Uh, did I want her to? Sure.

Q. Thank you, Detective Converse."

Record, pp. 580–81. Converse's testimony does not demonstrate that he had the intent to mislead Ms. Foster on December 29, 1990. At the time that he made the comment, he believed it to be an accurate statement. Converse testified that his purpose in making the comment that similar cases have been capital cases was to impress upon Ms. Foster the seriousness of the offenses being investigated. We conclude that Converse's comment, viewed objectively, was so vague and indefinite that it did not constitute a threat, coercion, or other improper inducement. *See Hampton v. State* (1984), Ind.App., 468 N.E.2d 1077, 1080.

■ Foster further alleges that his formal statement should not have been admitted because Converse represented to Karim that Foster's case would remain in the juvenile system and that it would look better to the prosecutor if statements were given. Prior to William's formal, videotaped statement, Karim asked Converse about what was going to happen to Foster. Converse informed Karim that that was up to the prosecutor and the courts. Karim then pressed the issue, stating that Converse must have handled other similar cases, to which Converse responded that the only other homicide he had involving a fourteen year old perpetrator had stayed in the juvenile system. On cross examination by the State, Karim testified as follows:

"Q. At no point did anyone ever make any promises to you as to how the case would be handled, did they? Were you made any promises?

A. Promises? How you ...

Q. Did anyone ever say to you this case will be handled in juvenile court and will not be handled in adult court?

A. No.

Q. In fact you were told that the decision was up to the Prosecutor's office, weren't you?

A. I was told two things.

Q. Were you told it was up to the Prosecutor's office to decide what charges to bring?

A. Yes."

Record, pp. 738–39. Thus, Foster's assertion that Karim was assured that Foster's case would stay in the juvenile system is not supported by the record.

With regard to the allegation that Converse told the family that it would look better to the prosecutor if statements were given, Foster points to the following testimony from Karim:

"A. Okay. He [Converse] said we could make a statement and, we could make the statement, do the video tapin' and show some type, and, and let the Prosecutor's office see this vide [sic], hear the audio and see the remorsefulness in the family and they may, uh, view it a lot different than if you don't make a statement and we take it over there just as is."

Record, p. 766. According to Converse's testimony, however, the issue was not whether the brothers would give a statement, but whether that statement would be videotaped:

"Q. Did the Defendants' father indicate to you any reservation as far as having the Defendants talk with you or was there something else that was the matter of concern regarding the videotaped statements?

A. Uh, Mr. [Karim], uh, initially objected to the video tape because he, I wasn't clear why, he was afraid it would get to the media and get on tv. That was my impression, he didn't object to them telling me their sides of what happened, just objected to me taking an audio visual, uh, statement.

Q. So, the concerns or the questions that are going back and forth during this period of time, do not have to do, as far as he discusses with you in relation to their talking to you about what hap-

pened, but just rather the form of how to take the statement?

A. Exactly. And, we also went into the, uh, into the statements about what is going to happen to Ahmad and tell me about your prior experiences, uh, and what type of case [sic] have you had? He, he expressed that concern. It was that concern and concern that it would be on the video tape, were his two concerns."

Record, pp. 607–08. Thus, the evidence most favorable to the trial court's ruling indicates that there was not a question whether Foster would give a formal statement; the only question was what form the statement would take.

Lastly, Foster contends that time pressures were applied in obtaining the rights waiver and formal statement. The record reveals that at the request of Ms. Foster, no interrogation of either of the brothers occurred pending the arrival of Karim. Converse testified that he told Ms. Foster "we will put everything on hold until your husband gets here." Record, p. 600. The boys' father arrived at approximately 4:00 p.m. Conflicting testimony was given regarding how much time Karim spoke with his sons prior to the unwarned admissions being made. Converse testified that Karim spent about an hour with his sons before Converse was called into William's interview room. Karim testified that he spent around forty minutes speaking with William, during the first part of which Converse was present until Karim asked for "five minutes" to speak with his son, at which point Karim spent approximately fifteen to twenty minutes alone with his son. No one told Karim that his time with William was up; instead, Karim informed Converse that William had something to say. Foster then confirmed that William's account was true. After the rights advisements, the family was informed that they were entitled to a conference and that they should take as much time as they wanted. Foster and his brother then conferred with their parents for approximately forty-five minutes. At 5:55 p.m., the taking of formal statements was commenced.

352

We find nothing in this sequence of events to indicate that improper time constraints were placed on Foster and his parents. Although Foster notes that Karim testified at the motion to suppress hearing that he felt pressure for the boys to give a statement because Converse had informed him that if there were no statements forthcoming "now," the boys could talk with the prosecutor's office on Monday morning, the State counters that Converse denied having made such a statement. Further, we agree with the State that even if Converse did make such a statement, it was too vague and indefinite to constitute improper inducement of Foster's statement.

We conclude that the trial court did not err in admitting Foster's formal, post-*Miranda* warnings statement.

For all of the foregoing reasons, Foster's convictions are affirmed.

AFFIRMED.

BARTEAU and RUCKER, JJ., concur.