David McGREW, Appellant–Defendant,

v.

STATE of Indiana, Appellee.

No. 86A05–9409–CR–378.

Court of Appeals of Indiana.

Nov. 27, 1996.

Rehearing Denied Jan. 13, 1997.

William E. Daily, Danville, for Appellant.

Pamela Carter, Attorney General of Indiana, James A. Joven, Deputy Attorney General, Indianapolis, for Appellee.

**1.** I.C. 35–42–4–2(1) (Burns Code Ed. Repl.1994).

## OPINION

SULLIVAN, Judge.

David McGrew (McGrew) appeals his conviction for criminal deviate conduct, a Class B felony.[1] McGrew presents four issues for our review, which we reorder and restate as follows:

1. Whether the trial court erred in admitting evidence seized from his home pursuant to a search warrant;

2. Whether the trial court erred in allowing two witnesses to testify as to what the victim told them about the crime;

3. Whether the trial court erroneously admitted expert testimony regarding analysis of hair samples found in McGrew's vehicle; and

4. Whether the evidence is sufficient to sustain McGrew's conviction.

We reverse and remand for a new trial. Because we anticipate the same issues arising on remand, we address all of them.

The evidence most favorable to the judgment reveals that in the evening of July 26, 1993, McGrew was having drinks at Levi's Bar in Williamsport when he struck up a conversation with J.W., a woman with whom he was slightly acquainted. After consuming additional drinks, the pair arranged to meet at DJ's, a bar in West Lebanon, where they continued to drink and talk together. Later, McGrew told J.W. that he wanted to go to a bar in Covington, and invited her to join him. They departed in McGrew's car, with McGrew driving.

Shortly after leaving DJ's bar, McGrew pulled the car into a dead-end side road to urinate. When he returned, he entered on the passenger side, directing J.W. to move behind the steering wheel. McGrew told J.W. that if she felt uncomfortable, she could start the car and drive away. After the pair sat in the parked car for a brief time, talking and kissing, McGrew attempted to unfasten J.W.'s pants. J.W. resisted, telling McGrew she wanted him to stop because she knew his girlfriend. McGrew cornered J.W. behind the steering wheel, grabbing her by the hair

and pushing her head toward his waist. J.W. then noticed that McGrew had removed his pants. As J.W. reiterated her unwillingness to engage in a sexual act with McGrew, he grabbed J.W. again, shoving her head toward his crotch and informing her in a hostile tone of voice that he knew she liked to "give head." Record at 438. Fearful of fleeing the car on the isolated country road, J.W. performed oral sex on McGrew.

McGrew got dressed and then returned to the passenger side. J.W. then drove McGrew's car to the site where her car was parked, and went in search of her friend, Cheryl Morgan (Morgan). She found Morgan and an acquaintance, Lynn Burkhart (Burkhart), at Robie's Bar in Attica, and told them what happened. Morgan advised J.W. to go to the hospital or the police station; J.W. refused at that time, believing that prosecution would be fruitless because "there wasn't any evidence" and it was "[her] word against his." Record at 455. J.W. changed her mind a few hours later, however, and early the next morning drove to the Warren County Sheriff's Department to report the incident.

On October 7, 1993, McGrew was charged by indictment with criminal deviate conduct. One week later, police executed a search warrant at McGrew's home and recovered a sexual device commonly known as a dildo. This device was part of the evidence offered by the State during the jury trial that followed, along with expert testimony concerning hair samples retrieved from McGrew's car and testimony by Morgan and Burkhart regarding statements made by J.W. after the incident.

In defense of McGrew, his girlfriend, Monica Burkes (Burkes), testified that he suffered from Peyronie's Disease, a condition which caused his erect penis to curve into a horseshoe shape and resulted in painful erections. Burkes testified that by fall of 1992, the condition had progressed to the point that McGrew's penis was noticeably deformed and he was unable to ejaculate or achieve a full erection. The State's medical witness, Dr. Norbert Welch (Welch), reviewed McGrew's medical records and agreed that McGrew had developed a severe case of Peyronie's Disease. Welch testified that it could be painful for someone in McGrew's condition to achieve even a partial erection, and that the radiation treatments which McGrew received were only used if the patient was in pain or severely deformed. Welch also stated, however, that the disease would not have affected McGrew's ability to ejaculate because a male can ejaculate absent an erection.

At the conclusion of the trial, McGrew was found guilty as charged, and was sentenced to ten years, suspended. McGrew was then placed on probation for ten years and ordered to serve three years in community corrections.

I.

*Warrant and Seizure*

McGrew contends that the trial court erred in admitting evidence seized by police during a search of his home, thus violating his rights under both the Fourth Amendment of the United States Constitution and Article 1, Section 11 of the Indiana Constitution.

On October 15, 1993, police searched McGrew's home pursuant to a warrant based on information contained in a probable cause affidavit prepared earlier that day by Al Lindsay (Lindsay), an investigator with the Warren County Prosecutor's Office. According to the affidavit, J.W. reported that during the commission of the crime, McGrew said "he would like to take her to his home where, among other things, he had a sexual device known as a 'dildo' he would like to use on her person". Record at 47–48. This information was provided by J.W. in an interview with Indiana State Police investigators and during a subsequent interview at which Lindsay was present.

Shortly before trial, McGrew filed a motion to suppress, asserting that the information supporting the search warrant was too stale to support a finding of probable cause and that the sexual device was not a proper subject for a search warrant in that it was not an instrument of the crime, fruit of the crime, or even present during the commission of the crime. In opposition to the motion, the State

maintained that the information was not stale, and even assuming *arguendo* that probable cause was lacking, the "good faith" exception to the warrant requirement applied. The trial court denied the motion on grounds that the staleness rule did not apply to the type of evidence under consideration. The dildo was subsequently admitted at trial over McGrew's timely objection.

### a. *Probable Cause*

■ Article 1, Section 11 of the Indiana Constitution provides that "[N]o warrant shall issue, but upon probable cause". When faced with a search and seizure challenge under the state constitution, we focus upon the reasonableness of the official behavior. *Moran v. State* (1994) Ind., 644 N.E.2d 536, 539, *reh'g denied.* The issuance of a search warrant is reasonable if, under the facts presented in the affidavit, a neutral and detached magistrate could find probable cause that the particular items sought to be seized are sufficiently connected with the criminal activity, and that the items will be found in a particular place at the time the warrant is issued. *Stabenow v. State* (1986) Ind.App., 495 N.E.2d 197, 200.

■ As a general rule, stale information will not support a finding of probable cause. *Raymer v. State* (1985) Ind., 482 N.E.2d 253, 255. Stale information gives rise only to mere suspicion and not reasonable belief, especially when the evidence is easily concealed and moved. *Id.* Our courts have not established a *per se* rule as to how much time may elapse between the obtaining of the facts upon which the warrant is based and the issuance of the warrant. *Id.* Instead, the remoteness of the information must be judged by the facts and circumstances of each case. *Armstrong v. State* (1982) Ind., 429 N.E.2d 647, 651. Factors to be considered include when the affiant acquired the information as well as the age of the information. *Id.* The affidavit clearly states that J.W. learned of the existence of the sexual device during the commission of the crime.[2]

Thus, the information was 81 days old when Lindsay executed the probable cause affidavit. The affidavit does not indicate when J.W. was interviewed by Lindsay and the State Police; however, during the suppression hearing, the State stipulated that the first interview occurred on August 9. Thus, a total of 67 days elapsed between the time Lindsay learned of the evidence and the date of the affidavit.

■ In addition to the time element, the nature of the seized items is also a factor to be considered in determining probable cause. *Williams v. State* (1981) Ind., 426 N.E.2d 662, *reh'g denied.* In *Williams,* police seized the ashes of a lady's burned handbag pursuant to an affidavit and warrant executed 67 days after a murder and armed robbery. The court found probable cause that the ashes would still be at the house more than two months after the crime: "Here, we do not deal with marijuana, which can be expected in the natural course of events to be smoked or moved into commercial channels, but with the burned remnants of a purse and its contents ... having an innocent appearance and no utility." *Id.* at 667.

The type of evidence seized also factored heavily in a more recent staleness challenge. In *Foster v. State* (1994) Ind.App., 633 N.E.2d 337, *trans. denied,* a panel of this court held that a 28–day–interval between the crime—felony murder and auto theft— and the issuance of the warrant did not render the information fatally stale. Again the court distinguished the seized items from controlled substances, which are expected to either be consumed or distributed. "[T]he items sought by police in this case were in part innocuous (child's car seat, dark fur garment, and adhesive tape) and in part the sort of property that the perpetrator reasonably could be expected to keep (Mobil Oil charge card, handgun, and ammunition)." *Id.* at 345.

---

**2.** McGrew asserts upon appeal that this information in unreliable because it is hearsay. When information in an affidavit for a search warrant is supplied by an informant, the affidavit must also set forth the reliability of the information. *Mickens v. State* (1985) Ind., 479 N.E.2d 520, 523, *reh'g denied.* However, when the information is provided by the victim of a crime, the affidavit of the police officer setting forth the victim's report is sufficient to justify the issuance of the warrant. *Id.*

■ Although a sexual aid might likely fall outside the category of items described as "innocuous", *Id.*, or those which have "an innocent appearance and no utility", *Williams, supra,* 426 N.E.2d at 667, it is, in all probability, the type of property which McGrew could reasonably be expected to keep for at least the length of time in question here. The trial judge's determination of probable cause was not unreasonable in the context of a staleness argument.

■ McGrew also asserts that the evidence lacks sufficient nexus with the crime for probable cause to exist. Although sufficient nexus automatically exists in the case of fruits, instrumentalities, or contraband, in the case of "mere evidence," probable cause must be examined in terms of cause to believe that the evidence sought will aid in a particular apprehension or conviction. *Warden, Maryland Penitentiary v. Hayden* (1967) 387 U.S. 294, 307, 87 S.Ct. 1642, 1650, 18 L.Ed.2d 782. *See* I.C. 35–33–5–1(a)(4) (Burns Code Ed. Repl.1994) (court may issue a warrant to search for property constituting evidence of an offense or tending to show that a particular person committed an offense). The State asserts that the evidence tends to show that McGrew was the person who committed the sexual act. However, McGrew's identity is not in issue. It is his position that the alleged crime involving J.W. and himself never took place at all. Be that as it may, the recovery of the dildo from McGrew's home renders J.W.'s testimony more credible with regard to the personal sexual nature of the conversation and conduct by McGrew on the occasion in question. The fact that a dildo "is not an unusual item", Appellant's Brief at 30, goes to the weight of the evidence and not to the issue of whether sufficient nexus existed between the evidence and the crime.

As to McGrew's federal claim, even assuming *arguendo* that it is valid, exclusion of the dildo under the Fourth Amendment is not warranted. Evidence obtained pursuant to searches conducted in good faith, pursuant to a judicially issued search warrant, is admissible at trial, even if the warrant is later determined to be invalid. *United States v. Leon* (1984) 468 U.S. 897, 923–24, 104 S.Ct. 3405, 3420–21, 82 L.Ed.2d 677. This exception is not applicable if: 1) the judge in issuing the warrant was misled by information knowingly or recklessly supplied by the affiant; 2) the warrant is facially deficient; or 3) the affidavit is so lacking in indicia of probable cause as to render entirely unreasonable the executing officer's belief in its existence. 468 U.S. at 923, 104 S.Ct. at 3421; *Cutter v. State* (1995) Ind.App., 646 N.E.2d 704, 714–15, *trans. denied.*[3]

■ McGrew contends that the evidence is not saved under the good-faith exception because Lindsay's failure to provide the dates of the interviews with J.W. misled the judge who issued the warrant. To prevail upon this claim, McGrew must demonstrate not only that Lindsay offered testimony with reckless disregard for its truth, but also that the misrepresentation was such that, had the judge known, it would have affected his determination of probable cause. *Cutter, supra,* 646 N.E.2d at 715. McGrew has shown neither. The date the affiant acquired the information is only one factor to be considered, along with the type of evidence sought and the date the victim learned of its existence. Here, we do not find the omission to be of a character that would have affected the judge's determination. Accordingly, even if the search warrant was invalid under McGrew's federal claim, the officers executing the warrant did so in good faith.[4]

---

**3.** It has been observed that the "good faith" exception is inapplicable when the officer who serves the warrant and conducts the search is the same officer who provides the misleading or erroneous information leading to the issuance of the warrant. *Bryant v. State* (1995) Ind.App., 655 N.E.2d 103. Although in *Cutter,* the officer who served the warrant provided the information resulting in issuance of the warrant, this court determined that at most, the information contained "minor mistakes and inaccuracies of

fact." 646 N.E.2d at 715. Thus the "good faith exception" was not rendered inapplicable.

**4.** The federal good-faith exception enunciated in *Leon* has been held applicable to Art. 1, Sec. 11 of the Indiana Constitution. *Hopkins v. State* (1991) Ind., 582 N.E.2d 345, 351, *reh'g denied. See* I.C. 35–37–4–5 (Burns Code Ed. Repl.1994). We need not apply this exception to McGrew's state claim, because we determine that the search pursuant to this warrant was reasonable under the state standard of reasonableness.

### b. *Prejudice*

McGrew also sought to exclude the evidence at trial, maintaining that it had slight probative value and baldly asserting, without further argument, that it was "probably the most prejudicial evidence" against him. Record at 520–21. His contentions upon appeal are somewhat more illuminating, albeit inherently contradictory. First, he asserts that the sexual device had scant probative value because "[a]lthough a dildo may not be as common of [sic] a household items as say a radio or television," Appellant's Brief at 20, "it was an item anyone could have at home". Appellant's Brief at 30. Conversely, he maintains that evidence that he possessed this particular household item was highly prejudicial because it could have led jurors to believe he was a "pervert" and therefore guilty. Appellant's Brief at 31.

Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Ind.Evidence Rule 403. The trial court has wide latitude in determining the probative value of evidence and its prejudicial impact. *Youngblood v. State* (1987) Ind., 515 N.E.2d 522, 526. Without doubt, the dildo was probative in that it corroborated J.W.'s account of the incident. At trial, however, no particular prejudice was asserted, beyond McGrew's claim that if it were admitted, "that's all we're going to hear during final argument." Record at 521. The trial court did not abuse its discretion in admitting the evidence.

## II.

### *Hearsay*

McGrew further argues that the trial court erred in admitting testimony by J.W.'s friends, Morgan and Burkhart, regarding statements made by the victim shortly after the crime. Prior to J.W.'s testimony at trial, both witnesses testified that when J.W. arrived at Robie's Bar, she was visibly shaken and told them that McGrew had hurt her by pulling her hair. Burkhart also testified that J.W. told them McGrew had forced her to perform oral sex. The witnesses spotted a lump on J.W.'s head, and urged her to go to the police or the hospital.[5]

After the prosecutor asked the witnesses if J.W. told them why she was upset, McGrew raised timely hearsay objections. In both instances, the prosecution claimed that the proffered testimony fell within a recognized exception to the hearsay rule because it was offered only to show the victim's state of mind. The trial court agreed and admitted the testimony over McGrew's objection.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(c). Hearsay is inadmissible unless admitted pursuant to a recognized exception. Evid.R. 802. Upon appeal, the State maintains that the testimony was admissible as either an excited utterance or as a statement of the declarant's mental or physical condition.

Statements concerning the declarant's *then existing* state of mind may be admitted under the exception recognized by Evid.R. 803(3). This includes hearsay statements offered to show the victim's state of mind *prior* to the crime if legally relevant. *Taylor v. State* (1995) Ind., 659 N.E.2d 535; *Davis v. State* (1992) Ind., 598 N.E.2d 1041, 1049, *cert. denied* (1993) 510 U.S. 948, 114 S.Ct. 392, 126 L.Ed.2d 340; *Lock v. State* (1991) Ind., 567 N.E.2d 1155, 1159, *cert. denied* (1992) 503 U.S. 991, 112 S.Ct. 1686, 118 L.Ed.2d 400. Here, the State offered the hearsay to show the victim's state of mind *after* the incident. Although such testimony

---

**5.** In his appellate brief, McGrew asserts that the trial court "impermissibly allowed these two witnesses to testify to what the victim told them about the crime." Appellant's Brief at 41. He does not, however, set forth the specific testimony he claims was improperly admitted, although he does provide record cites for portions of the witnesses' testimony. Included within these cited portions is testimony by Morgan that J.W. refused to go to the hospital or police because she said she was "scared." Record at 262. We do not address the admissibility of this statement by J.W. because it is not a statement "about the crime", which appears to be the target of McGrew's appellate challenge, but instead concerns her emotional state sometime after the event.

is not *per se* inadmissible, in this case the State failed to demonstrate any legal relevance, merely asserting that J.W.'s state of mind was at issue because the State had to prove McGrew knowingly or intentionally forced J.W. to perform oral sex.

 J.W.'s state of mind is not probative as to whether McGrew acted knowingly or intentionally. Further, even if it were relevant as to whether he "forced" her to engage in a sexual act, McGrew has not raised the issue of consent. Thus, the statements could only have been offered to show that McGrew committed the crime. The state-of-mind exception does not include statements of memory or belief to prove the fact remembered. Evid.R. 803(3). J.W.'s description of the incident is the type of evidence that the final phrase of Evid.R. 803(3) was designed to exclude.[6]

Such evidence describing the events surrounding a crime may be admissible as excited utterances. Under Evid.R. 803(2), a statement relating to a startling event made while the declarant was still under the stress of the excitement caused by the event is not excluded by the hearsay rule. For the "excited utterance" exception to apply, two basic requirements must be met:

" 'First, there must be a startling or exciting event that renders reflective thought inoperative. Second, the statement must be the spontaneous result of the event and not the result of reflective thought.' " *Goolsby v. State* (1987) Ind., 517 N.E.2d 54, 60 (quoting *Corder v. State* (1984) Ind., 467 N.E.2d 409).

J.W. testified that, after the crime, she drove McGrew's car to West Lebanon, retrieved her own car from the parking lot of DJ's bar, and then drove to Levi's bar in Williamsport in search of Morgan. Upon discovering that Levi's had closed for the evening, J.W. got back in her car and drove to Robie's bar in Attica. A patron of Robie's informed her that Morgan was in the upstairs portion of the establishment. J.W. ordered a drink from the bar before proceeding upstairs to recount the incident to Morgan.

 The excited utterance exception is premised upon the rationale that a person under the stress of a startling event will be incapable of the type of reflective thought which engenders fabrication. Thus, any statements will be spontaneous and reliable. Admission under the exception is not precluded if the statements are made by the victim in response to questioning by witnesses. *E.g., Block v. State* (1976) 265 Ind. 569, 356 N.E.2d 683, 685; *Hopper v. State* (1986) Ind.App., 489 N.E.2d 1209, 1212–13, *cert. denied* (1986) 479 U.S. 992, 107 S.Ct. 592, 93 L.Ed.2d 593. Nor does the fact that the victim left the crime scene and traveled some distance to report the crime render the exception inapplicable. *Block, supra.*

In *Block*, a rape victim in South Bend drove directly to her sister's home in Niles, Michigan—a 15–minute drive. When her sister asked what happened, the crying victim was able to describe the rape and provide the name of her assailant before losing consciousness and being admitted to the hospital. The court held that the excited utterance exception applied. "The hearsay statements admitted into evidence were made under circumstances and mental conditions which exclude the idea of deliberation and fabrication and render the utterances trustworthy." *Id.* at 685.

 Although the State did not seek to admit J.W.'s statements under the excited utterance exception, we will sustain a trial court's decision to admit evidence if any valid ground exists to support it, whether or not the trial court considered that ground. *See Hyde v. State* (1983) Ind., 451 N.E.2d 648, 650. Based upon the evidence of record in

---

6. Evid.R. 803(3) also allows the admission of statements regarding the declarant's then-existing physical condition, such as pain. J.W.'s statement that McGrew had pulled her hair recounted a painful experience in the past and not a description of pain she was presently experiencing. As such, it is not admissible under Evid.R. 803(3). *See Fleener v. State* (1995) Ind. App., 648 N.E.2d 652, 655, *aff'd in part and vacated on other grounds in part* (1995) Ind., 656 N.E.2d 1140 (grandmother's testimony that child molestation victim said "her bottom was sore" was admissible as a statement of her physical condition at the time she was perceiving the condition).

this case, however, we cannot say that J.W.'s statements to her friends—which were made after she traveled some distance, ordered a drink, and calmed herself—were necessarily bereft of reflective thought. The exception is inapplicable.

■ The trial court erred in admitting the testimony; however, the error is harmless. Admission of evidence which is cumulative of other evidence admitted at trial without objection does not constitute reversible error. *Wolfe v. State* (1990) Ind., 562 N.E.2d 414, 421. J.W. testified at trial that McGrew grabbed her by the hair and forced her to perform fellatio. The testimony by Morgan and Burkhart was only further evidence of the victim's statement and was therefore cumulative. *See Beck v. State* (1989) Ind.App., 544 N.E.2d 204, 209. Nor did the hearsay testimony constitute drumbeat repetition of the victim's statements recognized as reversible error by *Modesitt v. State* (1991) Ind., 578 N.E.2d 649, 651–52. Prior to the victim's testimony in *Modesitt,* three witnesses testified in great detail concerning what the victim had told them about the alleged acts of molestation. Here, Morgan's and Burkhart's testimony on this issue was brief and consistent with J.W.'s later testimony; thus, we find admission of the testimony is not cause for reversal. *See Schumpert v. State* (1992) Ind.App., 603 N.E.2d 1359, 1363.

### III.

#### *Hair Sample Analysis*

Two weeks after J.W. reported the incident to authorities, the State Police obtained a search warrant for McGrew's car. Several hairs were recovered from an area near the center of the front seat, and were compared with head and pubic hair samples obtained from both J.W. and McGrew. Upon appeal, McGrew contends that the trial court erroneously admitted expert testimony regarding microscopic analysis of these hairs. We agree.

A hearing was held outside the presence of the jury to determine the admissibility of testimony by Carl Sobieralski, a State Police DNA analyst trained in hair analysis who compared the hairs retrieved from McGrew's

car with the hair samples. At the conclusion of the hearing, McGrew moved to exclude Sobieralski's testimony, maintaining that microscopic hair analysis had not been empirically tested and that the results were too uncertain to be "scientifically ... sound." Record at 625–27. The trial court denied McGrew's motion, noting that expert testimony regarding microscopic hair analysis had previously been allowed in Indiana courts and that any questions regarding the reliability of the results went to the weight, and not the admissibility, of Sobieralski's testimony. The trial judge concluded that microscopic hair analysis "is not the traditional scientific evaluation", but instead is "simply a person's observations under a ... microscope," much like an expert in handwriting analysis compares handwriting exemplars. Record at 632.

Sobieralski then testified, over McGrew's objection, that examination of the hairs retrieved from McGrew's car revealed a hair dissimilar to McGrew's head hair sample, but "sufficiently similar" to J.W.'s head hair sample to be of common origin. The converse result was obtained when Sobieralski compared a pubic hair recovered from the car with McGrew's pubic hair sample. Sobieralski acknowledged that he was not testifying the hairs found in the car were from J.W.'s head and McGrew's pubic region, only that they were "sufficiently similar" to J.W.'s head hair and McGrew's pubic hair. Record at 657.

The gravamen of McGrew's argument is that microscopic hair analysis is unreliable and unscientific, and therefore inadmissible under Evid.R. 702(b), which provides:

"(b) Expert scientific testimony is admissible only if the court is satisfied that the scientific principles upon which the expert testimony rests are reliable." Evid.R. 702.

Specifically, McGrew contends that the State failed to lay a foundation of reliability which under Evid.R. 702(b) is a prerequisite to the admission of scientific testimony. McGrew further argues that in determining whether the underlying principles are reliable, the trial court should apply the framework articulated by the United States Su-

preme Court in *Daubert v. Merrell Dow Pharmaceuticals* (1993) 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469.

*Daubert* was decided under Federal Rule of Evidence 702, which provides:

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

Although the language of FRE 702 was adopted as subsection (a) of the Indiana rule, subsection (b) of the Indiana rule is unique in its express requirement that the expert scientific testimony be based upon reliable scientific principles. *See Steward v. State* (1995) Ind., 652 N.E.2d 490, 498, *reh'g denied.* A similar reliability requirement was read into the Federal Rules of Evidence by the United States Supreme Court in *Daubert,* however. *Daubert, supra,* 509 U.S. at 589, 113 S.Ct. at 2795. The Court held that the test established in *Frye v. United States* (1923) D.C.Cir., 293 F. 1013, which required the proponent of novel scientific evidence to demonstrate general acceptance in the relevant scientific community, did not survive the adoption of the Federal Rules. *Daubert, supra,* 509 U.S. at 586, 113 S.Ct. at 2793. In rebuking the strict *Frye* standard, the Court stressed that a rigid "general acceptance" requirement would be at odds with the liberal approach to opinion testimony evinced by the Federal Rules. *Daubert, supra,* 509 U.S. at 588, 113 S.Ct. at 2794.

*Daubert* set forth a non-exclusive list of factors to aid federal trial courts in making a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts at issue. *Daubert, supra,* 509 U.S. at 592–93, 113 S.Ct. at 2796. Factors which bear on this inquiry include: 1) whether the technique has been or can be empirically tested; 2) whether the technique has been subjected to peer review and publi-

cation; 3) the known or potential rate of error, as well as the existence and maintenance of standards controlling the technique's operation; and 4) general acceptance within the relevant scientific community. 509 U.S. at 593–95, 113 S.Ct. at 2796–97.

As an initial matter, we note that although Evid.R. 702(b) requires the trial court to be satisfied of the reliability of the scientific principles, the language of the rule itself does not provide a precise test. Shortly after McGrew filed his appellant's brief, however, our Supreme Court held that *Daubert* and its progeny, while not binding upon issues of Indiana evidence law, are "helpful" in applying Evid.R. 702(b). *Steward, supra,* 652 N.E.2d at 498.[7] The court observed that "[t]he concerns driving *Daubert* coincide with the express requirement of Indiana Rule of Evidence 702(b) that the trial court be satisfied of the reliability of the scientific principles involved." *Id.*

Prior to the adoption of Evid.R. 702(b), the standard used by the trial courts in determining the admissibility of scientific evidence was the subject of debate. *See Harrison v. State* (1995) Ind., 644 N.E.2d 1243, 1251–52 n. 15 (citing *Hopkins v. State* (1991) Ind., 579 N.E.2d 1297, 1305 (Dickson, J. dissenting)). A line of cases followed the *Frye* test for scientific evidence which was deemed "novel". *Hopkins, supra,* 579 N.E.2d at 1302–03 (DNA identification testimony); *Cornett v. State* (1983) Ind., 450 N.E.2d 498, 503 (voice spectrography). The *Frye* standard was not conclusively adopted, however, as a prerequisite for expert scientific testimony. Other cases expressly rejected a court determination of reliability as a foundational requirement, holding instead that so long as the expert was qualified, any questions regarding the reliability of the scientific methods went to the weight, and not the admissibility, of the expert testimony. *Rowan v. State* (1982) Ind., 431 N.E.2d 805, 816, *reh'g denied* (hair analysis); *Fleener v. State* (1995) Ind.App., 648 N.E.2d 652, 657, *aff'd in part and vacated in part* (1995) Ind., 656 N.E.2d 1140 (child abuse accommodation syndrome).

---

**7.** The Indiana Rules of Evidence became effective January 1, 1994; McGrew's trial was held May 10–13, 1994. Both the State's respondent's brief and McGrew's reply brief addressed the implications of *Steward* with respect to the trial court's ruling.

Following the adoption of Evid.R. 702(b), our Supreme Court made it clear that expert scientific testimony is no longer admissible in Indiana unless the *court* is satisfied that the scientific principles upon which the testimony rests are reliable. *Harrison, supra,* 644 N.E.2d at 1251. This requirement is imposed on all scientific evidence, regardless of whether the underlying principles are based on novel science or are rooted in established principles. Evid.R. 702(b); *e.g., Daubert, supra,* 509 U.S. at 593 n. 11, 113 S.Ct. at 2796 n. 11. At the same time, however, the standard for determining reliability has been broadened in accordance with *Daubert. Steward, supra,* 652 N.E.2d at 498.[8]

Faced with a proffer of expert scientific testimony, the court may take judicial notice of the reliability of underlying scientific principles if it is not subject to reasonable dispute. *Steward, supra,* 652 N.E.2d at 499; Evid.R. 201(a). In the absence of judicial notice, the proponent must provide sufficient foundation to convince the trial court that the relevant scientific principles are reliable. *Steward, supra* at 499; *Fleener v. State* (1995) Ind., 656 N.E.2d 1140, 1141. Once the court has determined that the particular scientific technique is capable of producing reliable results, however, any questions regarding the reliability of a specific testing procedure, or the results of a specific test, go to the weight of the scientific testimony and not its admissibility. *Hopkins, supra,* 579 N.E.2d at 1302–03.

In this case, the trial court did not expressly take judicial notice of the reliability of the scientific principles supporting microscopic hair analysis.[9] In fact, it is apparent from our review of the record that the trial judge did not consider hair analysis to be a "traditional" type of scientific evaluation requiring the proponent to lay a foundation of reliability. Although a colorable argument could possibly be made to support this view, neither party has argued that microscopic hair analysis is non-scientific testimony exempt from the foundational requirement imposed by Evid.R. 702(b).[10] For purposes of this case, therefore, it appears clear that we are dealing with more than a visual observation of a hair under a microscope. In this sense then there are "scientific principles" intimately and necessarily involved in the process which led to the expert testimony. The "scientific" principles at work in the case

---

8. At least one commentator has predicted that the application of *Daubert* will lead to contradictory results: more novel scientific procedures will be admitted while some established techniques, subject to greater scrutiny, may fail to pass the "gatekeeper" function now assigned trial judges. *See* G. Michael Fenner, *The Daubert Handbook: The Case, Its Essential Dilemma, and Its Progeny,* 29 Creighton L.Rev. 939, 953 (1996).

9. Where a jury serves as fact finder in a criminal case, a trial court must, upon taking judicial notice, instruct the jury " 'that it may, but is not required to, accept as conclusive any fact judicially noticed.' " *Baran v. State* (1994) Ind., 639 N.E.2d 642, 648 (quoting Evid.R. 201(g)).

10. Under both the Indiana and the federal rules, the general test for the admission of expert testimony regarding "scientific, technical, or other specialized knowledge" is that it must assist the trier of fact to understand the evidence or determine a fact in issue. Evid.R. 702(a). Federal courts are split, however, as to whether additional requirements imposed by *Daubert* should apply to non-scientific testimony. *See United States v. Quinn* (1994) 9th Cir., 18 F.3d 1461, 1464–65, *cert. denied,* — U.S. ——, 114 S.Ct. 2755, 129 L.Ed.2d 871 ("photogrammetry", in which the varying heights of known objects in a photograph are used to calculate the height of other objects in the photograph, does not require analysis under *Daubert*); *United States v. Velasquez* (1995) 3d Cir., 64 F.3d 844, 850, *reh'g denied* (questioning whether *Daubert* standard should be applied to handwriting analysis); *Iacobelli Const. v. County of Monroe* (1994) 2d Cir., 32 F.3d 19, 25 (determining that affidavits from geotechnical consultant and underground construction consultant are not the type of "junk science" targeted by *Daubert*); *United States v. Starzecpyzel* (1995) S.D.N.Y., 880 F.Supp. 1027, 1040–41 (*Daubert* not applicable to nonscientific field of forensic document examination). *But see Frymire–Brinati v. KPMG Peat–Marwick* (1993) 7th Cir., 2 F.3d 183, 186 (*Daubert* analysis applied to decision to admit accountant's testimony). Although Indiana courts have not addressed this issue, Evid.R. 702(b) refers only to "[e]xpert scientific testimony". Thus, it would appear that under our rules, the proponent of relevant expert testimony of a "technical" or "specialized" nature, as opposed to "scientific," need not lay a foundation of reliability. Admittedly, the line between "technical" or "specialized" testimony on the one hand, and "scientific" evidence on the other, may be extremely difficult to draw. However, because neither party argues that microscopic hair analysis in non-scientific, we leave that issue for another day.

before us are far from sophisticated assurances of reliability and of probative value. As noted, the conclusion of microscopic hair comparison is usually couched in terms merely of "similarity", "might be" or "could be". Such testimony does not lend itself to categorization as evidence of meaningful probative value. This deficiency has prompted a good deal of the debate concerning admissibility of hair analysis by comparison microscope. Compare *People v. Vettese* (1992) 195 Mich.App. 235, 489 N.W.2d 514 with *People v. Kosters* (1989) 175 Mich.App. 748, 438 N.W.2d 651 (Peterson, J., dissenting) and with *People v. Kosters* (1991) 437 Mich. 937, 467 N.W.2d 311 (Cavanagh, C.J. and Levin, J., dissenting). Early on, at least one commentator noted that hair analysis by microscope was primitive even in 1982 and not the best technological device to produce meaningful hair analysis evidence. The author proposed that hair analysis evidence was underemployed because of the valid criticism of less conclusive methods such as by comparison microscope, and that "the modern hair analyst has tools more powerful than the microscope ... and that the analyst can make many findings more specific than the general conclusion that two hair samples appear similar." Edward J. Imwinkelried, *Forensic Hair Analysis: The Case Against the Underemployment of Scientific Evidence* (1982) 39 Wash. & Lee L.Rev. 41. Be that as it may, we are not concerned here with whether hair analysis can be made more meaningful to a criminal jury or whether it can be made meaningful at all. Rather, we assume that hair analysis may aid the jury in its deliberations and may be relevant. Our task is simply to determine whether an appropriate and adequate foundation preceded the admission of the expert opinion.[11] Thus, we will examine the evidence presented by the State to determine if proper foundation was laid to satisfy the requirement of technique's reliability.

### a. *Daubert Foundation*

The sufficiency of a foundation for expert testimony is a matter within the sound discretion of the trial court, and upon appeal, we will reverse only for an abuse of that discretion. *Davis, supra,* 598 N.E.2d at 1049. During trial, Sobieralski explained that microscopic hair analysis consisted of visually examining the hair samples side-by-side under a comparison microscope, looking at a number of different physical characteristics. If, upon comparison, the hairs were found to be "sufficiently similar", Sobieralski would make a determination that they "could have come from" the same person. Record at 624. "Sufficiently similar" in the context of microscopic hair analysis was defined by Sobieralski in the following manner:

> "[I]f I took that pubic hair and dropped it into a pile of standards that was pulled from [J.W.], I'd be able to tell the difference. But when I dropped [the pubic hair recovered from the car] into a pile of standards of [McGrew], I could not tell the difference between them." Record at 651.

Microscopic hair analysis has been routinely admitted by state and federal courts for many years with little skepticism. *King v. State* (1988) Ind., 531 N.E.2d 1154; *Bivins v. State* (1982) Ind., 433 N.E.2d 387; *Fultz v. State* (1976) 265 Ind. 626, 358 N.E.2d 123; *see generally* Clive A. Stafford Smith & Patrick D. Goodman, *Forensic Hair Comparison Analysis: Nineteenth Century Science or Twentieth Century Snake Oil?*, 27 Colum. Hum. Rts. L.Rev. 227, 231 (1996). Our review of reported Indiana decisions yields but one case in which the reliability of the technique was directly challenged upon appeal. *Rowan, supra,* 431 N.E.2d 805. In *Rowan,* an expert testified that there were sufficient similarities between a hair found at the murder victim's home and the defendant's hair sample for them to be of common origin, and that the hair found at the crime scene "probably" came from the defendant. *Id.* at 816. Upon appeal, the defendant contended that

---

11. The State Police DNA analyst testified preliminarily that it was necessary in making physical comparison of one hair to another that he look at many different characteristics far outside the ken of lay jurors. He stated that it was necessary to look "at the medulla. Uh, the cortex. The cuticle. The root. The tip. Uh, cortical fusi. Uhm, ovoid bodies. Pigment. Uh, pigment dispersal. Uh, cuticle thickness. I look for gaping. Uh, condition of hair. Weathering. If its been dyed. If its been specially treated." Record at 615.

there was no scientific basis upon which the expert could formulate his opinion. *Id.* Our Supreme Court held that the evidence was admissible, noting that the "alleged lack of reliability can be brought out on cross-examination, and as long as the expert is otherwise qualified, goes to the weight of the evidence and not its competency." *Id.* Because *Rowan* did not require a foundational showing of reliability, however, it does not control in light of the gatekeeper function assigned trial judges under Evid.R. 702(b).

Whether microscopic hair analysis rests upon reliable scientific principles is an issue of first impression for Indiana courts. After briefing in this case was completed, however, a federal district court in Oklahoma ruled that microscopic hair analysis was inadmissible under *Daubert*. *Williamson v. Reynolds* (1995) E.D.Okl., 904 F.Supp. 1529, 1558. In *Williamson*, the defendant was convicted of murder in state court and sentenced to death. At his trial, a forensic expert testified that hair samples found at the crime scene were consistent with the defendant's head and pubic hair, and could have come from the same source. *Id.* The federal district in a subsequent habeas corpus proceeding found that microscopic hair analysis failed to pass muster under any of the *Daubert* prongs. *Id.* at 1558. In reaching its determination, the court cited "an apparent scarcity of scientific studies regarding the reliability of hair comparison testing", noting that the few available studies tend to point to the method's unreliability. *Id.* at 1556. Nor did the evidence gain admission through the "general acceptance" threshold. *Id.* at 1558. The court determined that general acceptance of microscopic hair analysis was limited to forensic experts testifying for the prosecution, and did not extend to the objective scientific community which in the past had aimed pointed criticism at the technique. *Id.*

Mindful of our Supreme Court's endorsement of *Daubert* and its progeny, we nonetheless conclude that *Williamson* is inapplicable to this case. The court in *Williamson* based its rejection of microscopic hair analysis in large part upon various published studies and peer review articles which criticized the technique and reported high error rates.

The data presented in these studies is not part of our record, and therefore we will not consider it upon appeal. App.R. 7.2(a). *Accord United States v. Bonds* (1993) 6th Cir., 12 F.3d 540, 552, *reh'g denied.* "[I]f we were to look at new scientific data available to us but not available to the [trial] court that made the admissibility determination, we would not be confining ourselves to *reviewing* the [trial] court's admissibility ruling, but would be making a *de novo* determination.... This is not the function of an appellate court." *Id.* at 553 (emphasis in original).

Here, the State failed to present any evidence to satisfy the first three prongs of *Daubert*. Upon questioning by McGrew's counsel and the trial court, Sobieralski acknowledged that he was not aware of any error ratio for the technique, nor was he aware of any articles or journals disputing the methodology. He also admitted that he did not know the statistical percentages of certain hair characteristics in the general population or the probability of a particular hair sample coming from persons other than McGrew or J.W.

■ Sobieralski did make the bald assertion that microscopic hair analysis was accepted in the scientific community, but did not describe *which* scientific community nor expound upon the degree of acceptance. "A 'reliability assessment does not require, although it does permit, *explicit* identification of a relevant scientific community and an *express determination* of a particular degree of acceptance within that community.'" *Daubert, supra,* 509 U.S. at 594, 113 S.Ct. at 2797 (quoting *United States v. Downing* (1985) 3d Cir., 753 F.2d 1224, 1238 (emphasis supplied)). In determining whether Sobieralski's uncontroverted statement was sufficient to satisfy the trial court of the scientific validity of microscopic hair analysis, the Ninth Circuit Court of Appeals' consideration of *Daubert* on remand is instructive. *Daubert v. Merrell Dow Pharmaceuticals* (1995) 9th Cir., 43 F.3d 1311, *cert. denied* (1995) — U.S. ——, 116 S.Ct. 189, 133 L.Ed.2d 126 ("*Daubert II*"). The federal district court, applying *Frye*, had found that scientific evidence linking the drug Bendectin with birth

defects was inadmissible, despite assurances from the plaintiffs' experts that the methodology they utilized was generally accepted in the scientific community. *Id.* at 1315. The Ninth Circuit held that absent evidence addressing testing, error rates, or peer review, the experts' "bald assurance of validity" was not sufficient to satisfy a trial court that the scientific evidence met the requisite standard of reliability. 43 F.3d at 1316. A proponent of scientific evidence must demonstrate that the expert's findings are based on sound science, which requires some *objective,* independent validation of the expert's methodology. *Id.* Methods accepted by a minority of the scientific community may be sufficient if the proponent explains the expert's methodology and demonstrates in an objectively verifiable manner that the expert has both chosen a reliable scientific method and followed it faithfully. *Id.* at 1319 n. 11.

> "For such a showing to be sufficient, the experts must explain precisely how they went about reaching their conclusions and point to some objective source-a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like—to show that they have followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in their field." *Id.* at 1319.

In *Daubert II,* the Ninth Circuit found that proponents of the scientific testimony failed to make the requisite showing, relying "entirely on the experts' unadorned assertions that the methodology they employed comports with standard scientific procedures", without explaining their methodology or pointing to any external source to validate that methodology. *Id.* A similar failing is present in this case. Sobieralski did testify concerning the methodology he employed. However, his testimony that he was trained and determined to be proficient in standard procedures which had been used by the State Police for a number of years did not demonstrate external, objective validation of his methods. Although, under *Daubert,* the methodology need not be embraced by a majority of the scientific community, our courts have generally extended the boundaries of the "relevant scientific community" beyond the proponents who generate data solely for introduction into evidence. *Cornett, supra,* 450 N.E.2d at 503. Thus, the State failed to lay a *Daubert* foundation.

Nor is Sobieralski's testimony admissible under Evid.R. 101(a), which allows courts to apply common law if the rules do not cover a specific evidence issue. The text of Evid.R. 702(b) does not provide a test for reliability, nor, despite its designation of *Daubert* as "helpful", has our Supreme Court adopted a precise test. In fact, the court has stressed that *Daubert* is "not binding upon the determination of state evidentiary law issues". *Steward, supra,* 652 N.E.2d at 498. Thus, unlike the federal court in *Williamson* which was bound by *Daubert* in ruling upon the reliability of hair evidence, Indiana courts are encouraged to look to our common law to flesh out the test for reliability, subject to the Evid.R. 702(b) requirement that the court be satisfied of the reliability of the underlying principles. *See Harrison, supra,* 644 N.E.2d at 1251–52 n. 15.

As previously noted, our search of Indiana case law failed to reveal any decisions in which the reviewing court expressly determined the scientific validity of the principles underlying microscopic hair analysis. Prior to the adoption of Evid.R. 702(b), however, at least one type of visual comparison was determined to be reliable. In *Niehaus v. State* (1977) 265 Ind. 655, 359 N.E.2d 513, *cert. denied* (1977) 434 U.S. 902, 98 S.Ct. 297, 54 L.Ed.2d 188, our Supreme Court held that bite mark analysis, a novel technique at the time, was sufficiently reliable to allow expert opinion that bite marks found upon the murder victim had been left by defendant. *Id.* 516. Photographic negatives of the defendant's teeth and the bite marks were superimposed upon one another, and the expert's opinion was based upon the number of common reference points. The court distinguished bite mark analysis from polygraph testing, where unreliable results may be produced by influences that cannot be controlled or compensated for by the examiner. *Id.* Bite mark analysis "is simply a matter of comparison of items of physical evidence to determine if they are reciprocal." *Id.*

Although microscopic hair comparison is similar to bite mark analysis, *see Bundy v. State* (1984) Fla., 455 So.2d 330, 339, we do not read *Niehaus* as paving the way for admission of hair testimony absent some demonstration of its evidentiary validity. *Niehaus* was decided six years before our Supreme Court adopted the *Frye* test for novel scientific evidence. *Cornett, supra,* 450 N.E.2d at 503. *Cornett* and its progeny were superseded by *Steward, supra,* 652 N.E.2d at 498. Whether the court's reliability assessment in *Niehaus* has survived the adoption of 702(b) is far from clear, and we will not use it as a bootstrap method of determining that microscopic hair analysis is reliable as a matter of law.

Thus, the trial court erred in admitting Sobieralski's testimony. In so holding, we stress that we are *not* establishing a *per se* rule of inadmissibility for microscopic hair analysis. From our reading of *Williamson* and various law review articles addressing forensic hair analysis, it is clear that the technique has been empirically tested and subjected to peer review, with a resultant determination of error rates. Thus, a proponent of microscopic hair analysis could conceivably come to court armed with data, studies, and scholarly articles to help meet at least three of the *Daubert* prongs. Here, the State mistakenly believed that a *Daubert* foundation was only required for novel scientific techniques, and thus did not attempt to lay the requisite foundation of evidentiary reliability.[12]

■ Errors in the admission or exclusion of evidence are to be regarded as harmless unless they affect the substantial rights of a party. *Fleener, supra,* 656 N.E.2d at 1141; Ind.Trial Rule 61. To determine whether an error in the introduction of evidence warrants reversal, we examine whether its probable impact on the jury, in light of *all* the evidence in the case, is sufficiently minor so as not to affect the substantial rights of the parties. *Fleener, supra* at 1142.

Introduction of inadmissible evidence is not prejudicial error if the evidence is merely cumulative. *Traver v. State* (1991) Ind., 568 N.E.2d 1009, 1013. Reversal is compelled, however, if the record as a whole discloses that the erroneously admitted evidence " 'was likely to have had a prejudicial impact upon the mind of the average juror, thereby contributing to the verdict.' " *Traver, supra* (quoting *Mitchell v. State* (1972) 259 Ind. 418, 287 N.E.2d 860, 863.)

■ The evidence that hair found in McGrew's car "probably" came from J.W.'s head is merely cumulative of McGrew's admission that J.W. was in his car. The same cannot be said, however, of Sobieralski's testimony that a pubic hair found on the front seat was "substantially similar" to McGrew's. In this case, the conviction rested in large part upon J.W.'s credibility. The pubic hair comparison is the only physical evidence corroborating J.W.'s assertion that McGrew removed his pants. McGrew did not admit to disrobing in his car, and there was no medical evidence that an act of sexual deviate conduct had occurred, although Morgan and Burkhart did testify that J.W. had a knot on her head. Conversely, the State's own medical expert acknowledged that McGrew suffered from a severe case of Peyronie's dis-

12. Nor should the inconclusiveness of microscopic hair analysis serve as a bar if the proper foundation is presented. The focus of the court's inquiry should be the reliability of the underlying scientific methods and principles and not the conclusions which they generate. *Daubert, supra,* 509 U.S. at 595, 113 S.Ct. at 2797. The trustworthiness of the evidence, and thus its admissibility, hinges on the technique's "scientific validity", that is, whether the principle supports what it purports to show. *Daubert, supra,* 509 U.S. at 590 n. 9, 113 S.Ct. at 2795 n. 9. Unlike fingerprints, which can identify specific individuals, microscopic hair analysis merely purports to show that two hairs could have come from a common source if they share so many common characteristics that they are visually indistinguishable under a microscope. *Daubert* does not require that the subject of expert testimony be known to a certainty. *Daubert, supra,* 509 U.S. at 590, 113 S.Ct. at 2794. Any questions about the certainty of the scientific results are a matter of weight for the jury. *Bonds, supra,* 12 F.3d at 563 (citing with approval *United States v. Brady* (1979) 6th Cir., 595 F.2d 359, 363 (lack of certainty in hair analysis goes to the weight and not the admissibility)). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert, supra,* 509 U.S. at 596, 113 S.Ct. at 2798.

ease which could make it extremely painful for him to become sexually excited.

The pubic hair testimony would likely have a significant impact upon the mind of the average juror because it is the only physical evidence tending to show that McGrew bared his genitals. This impact is heightened by the special aura of trustworthiness surrounding expert testimony, and the fact that, in the case of microscopic hair analysis, jurors do not generally have the opportunity for direct evaluation. *See Williamson, supra,* 904 F.Supp. at 1557. We conclude that the erroneous admission of the pubic hair evidence constitutes reversible error because, reviewing the record as a whole, there is a substantial likelihood that this evidence contributed to the conviction.

## IV.

### *Sufficiency of the evidence*

Finally, we consider McGrew's challenge to the sufficiency of the evidence in order to determine whether a retrial is appropriate.

In examining the sufficiency of the evidence, we will not reweigh the evidence or judge the credibility of the witnesses. These are matters exclusively within the province of the jury. *Tillman v. State* (1994) Ind., 642 N.E.2d 221, 223. An appellate claim of insufficient evidence will only prevail if, considering the probative evidence and the reasonable inferences which support the judgment, we conclude that no reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. *Davis v. State* (1995) Ind., 658 N.E.2d 896, 897, *cert. denied* (1996) —— U.S. ——, 116 S.Ct. 1275, 134 L.Ed.2d 221. We will only impinge on the jury's resolution of credibility disputes in those rare instances when we are confronted with inherently improbable or incredibly dubious testimony which no reasonable person would believe. *Id.; Shippen v. State* (1985) Ind., 477 N.E.2d 903, 904.

In order to convict McGrew, the State was required to prove that McGrew had "know-

ingly or intentionally cause[d] another person to perform or submit to deviate sexual conduct when: (1) the other person is compelled by force or imminent threat of force". I.C. 35–42–4–2 (Burns Code Ed. Repl.1994). Deviate sexual conduct, as defined by the Indiana code, includes an act involving the sex organ of one person and the mouth of another person. I.C. 35–41–1–9 (Burns Code Ed. Repl.1994).

The victim testified that after she resisted McGrew's sexual advances, he grabbed her by her hair, pushed her head toward his genitals, and forced her to perform fellatio until he ejaculated into her mouth. Although, as we previously determined, the hearsay statements and the hair evidence were improperly admitted, J.W.'s testimony was corroborated in part by the discovery of the dildo at McGrew's home and by Morgan's and Burkhart's testimony that they had seen a knot on the back of J.W.'s head following the incident. McGrew asserts, however, that the improbability of the events as described by J.W., combined with inconsistencies between her testimony at trial and her statements to police, render the victim's testimony incredibly dubious.

The uncorroborated testimony of the victim may support a conviction for criminal deviate conduct. *Shippen, supra,* 477 N.E.2d 903, 904; *Sholar v. State* (1993) Ind. App., 626 N.E.2d 547, 550. Application of the "incredible dubiosity" rule is limited to cases where a sole witness presents *inherently contradictory* testimony which is equivocal or the result of coercion *and* there is a complete lack of circumstantial evidence of the appellant's guilt. *Tillman, supra,* 642 N.E.2d 221, 223.

J.W.'s testimony is neither inherently contradictory, nor is there a complete lack of circumstantial evidence. Although there are minor discrepancies in the various accounts she gave to police of the incident and in her trial testimony,[13] it is within the prov-

---

13. In her statements to police she gave approximate times for both her and McGrew's arrivals and departures at the various drinking establishments they visited that evening; however, at trial

she testified she was unsure of the specific times. There were also minor discrepancies in the accounts she gave to police and at trial of the time when she and McGrew returned to her car, rang-

ince of the jury, in assessing credibility, to resolve conflicts between J.W.'s prior statements and her trial testimony. *Hill v. State* (1995) Ind.App., 646 N.E.2d 374, 378. Our examination of J.W.'s testimony reveals that it was not incredibly dubious.

To bolster his sufficiency claim upon appeal, McGrew also asks us to examine exculpatory evidence presented at trial which conflicted with J.W.'s testimony. Any conflicts between the testimony presented by the defendant and by the State are for final resolution by the trier of fact, and not the appellate courts, unless it may be said that the testimony of the State's witnesses was inherently improbable and runs counter to human experience. *Robey v. State* (1990) Ind., 555 N.E.2d 145, 149; *Olinger v. State* (1984) Ind., 463 N.E.2d 1385, 1387.

▮ McGrew argues that J.W.'s recounting of the incident is improbable in light of his medical condition. We were faced with a similar argument in *Wagner v. State* (1990) Ind.App., 562 N.E.2d 421, 424, where we held that the uncorroborated testimony of the victim was sufficient to sustain a conviction for child molesting involving fellatio, notwithstanding testimony by the defendant and his wife that he was unable to achieve erection. "[T]he resolution of such conflicts in evidence is within the province of the jury." *Id.* Nor is the sequence of events, as described by J.W., inherently improbable. Her initial willingness to engage in a romantic encounter with McGrew, her disinclination to drive away or leave the car when events went awry, and her failure to immediately perceive in the darkness that McGrew had removed his pants does not necessarily run counter to human experience.

McGrew also presented several alibi witnesses who testified that he was at various locations in the latter part of the evening which would have made it impossible for him to have been with J.W. on the deserted road during the time frame that the crime occurred. The credibility of alibi witnesses' testimony is also a matter for the jury to determine. *Griffin v. State* (1986) Ind., 493

N.E.2d 439, 443. If the State's evidence is credible, the jury is free to disbelieve the defendant's alibi evidence. *Id; Moore v. State* (1985) Ind., 484 N.E.2d 20, 21, *reh'g denied.*

Because there was admissible evidence of record to support McGrew's conviction, the cause may be retried.

McGrew's conviction for criminal deviate conduct is reversed, and the cause is remanded for a new trial.

FRIEDLANDER, J., concurs.

CHEZEM, J., dissents with separate opinion.

CHEZEM, Judge, dissenting.

I respectfully dissent. I agree with the majority's opinion in every respect except in its resolution of the hair analysis issue. I do not agree with the majority that we must guard against the admission into evidence of any new science until we are more certain than we will ever be that 1) the theory is true and undisputed, 2) no human error contaminated the testing process, and 3) the person offering the results of a scientific process is an expert.

I see no reason for, or value in, adding to the complexity of the law of evidence in Indiana. Our supreme court cited the simplification of Indiana law as one of the reasons why it adopted the Indiana Rules of Evidence. I thought that meant that the new rules—rather than a host of cases written by the Court of Appeals—would provide the requirements for the admission of evidence in the cases which followed. Obviously, I am in error.

More importantly, I think the majority errs in taking a simple observation that barely qualifies as science yet has been accepted into evidence for over one hundred years, and attaching rigid requirements to the admission of that simple observation. If the testimony in question involved complicated testing, new theories, or new processes, I

ing anywhere from 10:30 p.m. to 11:30 p.m. Additionally, although she told police that she thought McGrew had an erection, at trial she

testified that she wasn't sure, but that his penis seemed normal but a little small.

would agree with compelling the proponent of the evidence to set out the foundation required for the admission of new scientific evidence. However, the law should not make an impossibility of itself. Every time we add a needless requirement, we artificially complicate the law, making it less effective and less efficient.

The defendant was not unduly prejudiced by the admission of testimony that the pubic hair in question was substantially similar to the defendant's. Such testimony, while admissible, is so inconclusive that without additional facts there is not sufficient evidence for a conviction. I would find the results of looking at two hairs under a microscope admissible, and would affirm the conviction.