**Myron OKKEN, Plaintiff and Appellant,**

v.

**Martha OKKEN ESTATE, Defendant and Appellee.**

**Civ. No. 10529.**

Supreme Court of North Dakota.

April 24, 1984.

Chapman and Chapman, Bismarck, for plaintiff and appellant; argued by Charles L. Chapman, Bismarck.

Zuger & Bucklin, Bismarck, for defendant and appellee; argued by Robert V. Bolinske, Bismarck.

ERICKSTAD, Chief Justice.

This is an appeal by the plaintiff, Myron Okken, from a judgment entered by the District Court of Grant County on June 23, 1983, pursuant to a jury verdict finding the will of Martha Okken valid and not the result of undue influence. We affirm.

Myron and Clifford Okken are the two surviving children of Martha Okken, who died on June 18, 1980. Their father, Milton Okken, and Martha were divorced in 1958. Martha left a will in which she named Clifford the sole beneficiary of her estate. Doris Okken, Clifford's wife, was named contingent beneficiary in the event Clifford did not survive Martha. Roxanne and Annette Okken, the children of Clifford and Doris, were named contingent beneficiaries in the event neither Clifford nor Doris survived Martha. Martha appointed Clifford as executor if he survived her; and if he did not, Doris was to serve as executrix. The will also included the following clause:

"My failure to make provisions in this my Last Will and Testament for my son, MYRON OKKEN, other grandchildren not mentioned in my Will, and any other persons not specifically mentioned in my Will, is intentional."

On October 22, 1980, Myron appealed to the District Court of Grant County from an order of the County Court of Grant County directing that Martha's will be admitted to probate. A trial was held on May 28, 1981, after which a jury found that undue influence had been exercised over Martha in the execution of her will. The district court, the Honorable Benny A. Graff, granted a motion by Clifford for judgment notwithstanding the verdict, and, in the event this Court reversed the judgment n.o.v., granted Clifford's motion for a new trial. In *Okken v. Okken*, 325 N.W.2d 264 (N.D. 1982), we reversed the judgment n.o.v., but affirmed the court's granting of the motion for a new trial. A new trial was had, commencing on June 7, 1983. The jury returned verdict in favor of Martha's Estate, finding that Martha's will was *not* the result of undue influence.

We will briefly review the facts. On or about June 14, 1975, Clifford and his family came from their home in Oregon to visit Martha and other relatives in North Dakota. On June 23, 1975, Martha executed a deed transferring three quarters of land, for and in consideration of one dollar, to Clifford, reserving a life estate in herself. Clifford and his family left North Dakota in early July, 1975, spent about a week traveling, and arrived in Oregon on or about July 12, 1975.

■ Martha executed her will on July 11, 1975. Ronald J. Weikum, the attorney who drafted Martha's will, testified that Martha specifically indicated, at the time the will was prepared, that she did not want anything to go to Myron. Mr. Weikum also testified that on June 28, 1977, Martha and Myron came to his office to discuss the deed Martha had given Clifford. Martha wanted to know what effect the deed had on her ability to continue to deal with the land. Martha "expressed surprise that she would not have the right ... to pass on that property after she died." A lawsuit was commenced thereafter against Clifford to have the three quarters of land reconveyed to Martha. The action was voluntarily dismissed by Martha in December, 1978.

Myron raises two issues on appeal:

I. Did the trial court err in admitting evidence of the relations between Myron and Martha, including evidence of events which took place 17 years prior to the execution of Martha's will?

II. Did the trial court err by refusing to allow Myron to introduce, and to conduct examination upon two deeds executed by Milton Okken, on April 25, 1975, in favor of Clifford?

Rulings on evidence cannot be assigned as error unless (1) a substantial right of the party is affected, and (2) the nature of the error was called to the attention of the trial court, so that the trial court would have an adequate basis for making a ruling, and so that a record would be made which would permit informed appellate review. *See* Rule 103(a), N.D.R.Ev.

Myron contends that the trial court erred in admitting evidence of past relations between himself and Martha. Doris' testimony includes an accounting of what Martha had told her over the years about Myron's behavior and the impact Myron's behavior had on Martha. Myron's attorney objected to the admission of this evidence on grounds it was irrelevant hearsay. Counsel for Martha's Estate argued it was his intent to show a pattern of relations between Myron and Martha. Illustrative of the many instances of alleged conduct related by Doris are (1) accusations by Myron after Martha's divorce from Milton in 1958 that Martha "was having affairs with the hired men"; (2) a letter dated December 26, 1961, from Myron to Martha telling her to "grow up before its too late" and to "start leading a respectable life"; (3) a period of time, from Martha's divorce in 1958 until 1966 or 1967, in which Myron never saw his mother; (4) alleged abuse inflicted by Myron upon his ex-wife and children; (5) an account of a trip made by Martha and Myron to Oregon in late December, 1974, and early January, 1975: "They were fighting. They were constantly at each other's throats when they were at our house. If one would say something the other one would snap back; there was a dispute," and (6) Doris' account of a telephone conversation had with Martha after Martha returned from Oregon to North Dakota; Martha said Myron had "really worked her over" about her property, and that Myron had said, "You can take your property and shove it up your ass."

■ The test as to whether evidence is relevant or irrelevant is whether or not it would reasonably and actually tend to prove or disprove any matter of fact in issue. *Mehus v. Thompson*, 266 N.W.2d 920, 923 (N.D.1978); Rule 401, N.D.R.Ev. The issue at trial was whether or not, at the time of the execution of the will, Martha was subject to undue influence. The elements necessary to invalidate a will on the ground of undue influence are (1) that the testator was subject to such influence; (2) that the opportunity to exercise it existed; (3) that there was a disposition to exercise it; and (4) that the result appears to be the effect of such influence. *Okken v. Okken*, supra, 325 N.W.2d at 267–68; *In re Burris' Estate*, 72 N.W.2d 884, 889 (N.D. 1955). To be undue, the influence must operate at the time the will is made and must dominate and control the making of the will; it must be such as to make the will express the purpose and intent of the person exercising the influence and not the purpose and intent of the testator. *Okken, supra; Bender v. Bender*, 72 N.W.2d 220, 223 (N.D.1955).

Does the admitted evidence tend to prove or disprove that, at the time of the execution of the will, Martha was subject to undue influence?

■ We first note that Doris' testimony was not inadmissible under our hearsay rule. Rule 803(3), N.D.R.Ev., reads as follows:

"The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

\*      \*      \*      \*      \*      \*

"(3) *Then Existing Mental, Emotional, or Physical Condition.* A statement of the declarant's then existing state of mind, emotion, sensation, or physical con-

dition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), *but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.*" [Emphasis added.]

Necessity and expediency are the grounds for this exception to the hearsay rule:

" 'In wills cases the special need for the hearsay use of the testator's declarations to show his previous acts is apparent. The testator is dead and is usually the one who best knew the facts, and is often the only one who had any knowledge of them. The special reliability, though it is arguable that he may often want to deceive his relatives, is strongly supported by his first-hand knowledge and by his lack of selfish interest.' " 4 Weinstein & Berger, *Weinstein's Evidence* ¶ 803(3)[05] (1981) (quoting from McCormick, *Evidence* § 271 at 577 (1954).

It is argued by counsel for Martha's Estate that evidence of Myron's relations with Martha were relevant to explain why she acted as she did in excluding Myron from her will, and to rebut Myron's allegation of undue influence. Analogous support is provided by reference to *In re Estate of Bogner*, 184 N.W.2d 718 (N.D.1971). In *Bogner* the testator had drawn lines through various provisions in his will, obliterating any reference to his son-in-law. Evidence admitted at trial revealed that it had become known to the testator that his son-in-law had participated in certain depraved moral conduct, including incestuous relationships with one of his daughters which began in 1956 and continued for some years thereafter. The testator died in 1968. Although authority cited by this Court indicated that proof of an intent to revoke one's will may be assumed from the fact that an obliteration occurred, we deemed it proper in *Bogner* to show other facts and circumstances, including declarations of the testator, which would indicate an intent to revoke. We said:

"Since it is proper to consider the evidence with reference to Mr. Fallgren's [the son-in-law's] infidelity and the subsequent divorce from Mr. Bogner's [the testator's] daughter, and its profound impact on Mr. Bogner, certainly such evidence would buttress the presumption that Mr. Bogner obliterated those portions of his Last Will and Testament concerning his ex-son-in-law as to any prospective inheritance that Mr. Fallgren might receive under Mr. Bogner's will." 184 N.W.2d at 723.

■■■ We conclude that the trial court, under the circumstances of this case, did not err in admitting evidence of Myron's relations with his mother. Such evidence tends to prove what Martha's state of mind and feelings toward Myron were at the time she executed her will. It supports the probability that her will was made in accordance with such state of mind, rather than as the result of undue influence. *See* 3 Bowe-Parker: Page on Wills, Ch. 29, §§ 29.126–127 (1961); 94 C.J.S. Wills § 249 (1956 & Supp.1983). Of course, trial judges should exclude evidence which is offered to show the relations of the parties to one another which relates to a time which is so remote from the execution of the will that it could not reasonably tend to prove the existence or nonexistence of undue influence. Whether or not evidence should be excluded on the ground of remoteness, however, is a matter largely within the discretion of the trial court. *Jones v. Boeing Company*, 153 N.W.2d 897, 905 (N.D.1967); *In re Graf's Estate*, 119 N.W.2d 478, 480 (N.D.1963). The instant case involves a distinct pattern of hostility between the testator and contestant beginning after Martha's divorce in 1958. In our view, the admission of more remote evidence, along with recent evidence of instances of ill-will between these individuals, does not constitute an abuse of discretion.

The record contains, pertinent to Myron's second assignment of error, the following offer of proof:

"MR. CHAPMAN: ... The reason that I have requested this type of a procedure, is because in the last trial of course we had discussed this matter prior to the actual initiation of the trial and I was aware of the ruling of the Court.[1] The items that I am talking about and would offer proof of relates to the deeds which were executed in April of 1975, two deeds from Milton Okken, who was the father of Myron and Clifford, those deeds going to Clifford Okken. . . .

\*    \*    \*    \*    \*    \*

[W]e would have proposed to offer those into evidence to inquire of Clifford Okken about that transaction, to have Myron Okken testify as to statements which his mother made to him regarding the tie-in of these deeds to the deeds in June of 1975.

"Ron Weikum was the attorney who drew the deeds from Milton Okken to Clifford Okken, we would have had his testimony in on it. I think that in the testimony of Mathilda Moen it kind of came in indirectly and obviously we didn't pursue it because of the ruling of the Court, but Mathilda Moen has some information, or had some information on these transfers from Milton Okken to Clifford Okken.

"Those are the two deeds that we would offer proof of and would offer the interrogation of those witnesses upon those two deeds.

\*    \*    \*    \*    \*    \*

"THE COURT: Well, it would have been the Court's ruling that the proposed exhibits would have been irrelevant.

\*    \*    \*    \*    \*    \*

"MR. CHAPMAN: ... I believe that the two witnesses, Ron Weikum and Mathilda Moen, who obviously did not have the benefit of the admonitions of their counsel to stay away from that

area, I think did testify that there was a tie-in between deeds from the father and the deeds from the mother. Those are the deeds from April of 1975 that would tie-in to the deeds of June of 1975."

The excluded deeds were made a part of the record. In the first deed, dated April 25, 1975, Milton Okken and his wife, Clara, transferred to Clifford, for and in consideration of five thousand dollars, one quarter of land. A second deed, also dated April 25, 1975, transfers two quarters of land to Clifford, for and in consideration of ten thousand dollars, and reserves a life estate in Milton and Clara.

Myron argues to this Court that without introduction of the deeds, and without testimony thereon, it was impossible to inquire into the "tie-in" between the deeds and Martha's will, and to ultimately prove that Clifford knew and participated in Martha's decision to make the will.

■ Myron's offer of proof did not include the substance of the proposed testimony of Myron Okken, Clifford Okken, Ron Weikum, and Mathilda Moen relating to the alleged "tie-in" between the deeds and Martha's will. In *Ostmo v. Tennyson*, 70 N.D. 558, 296 N.W. 541, 545 (1941), this Court, in reference to the trial court's denial of the defendant's offer of proof, said:

"An offer of proof must be definite enough so that the court can know what facts are sought to be introduced in order to see whether these facts would have any bearing upon the case. The court is not required ... to guess at what the offerer has in mind."

A mere general offer of proof without producing the witness or stating the evidence whereby the fact in issue is to be proved or disproved affords no ground for appeal. *Miller v. Larson*, 95 N.W.2d 569, 572 (N.D. 1959).

---

1. The new trial was originally commenced on March 29, 1983, and Myron completed presenting his case on that day. Clifford Okken suffered a stroke during the night of March 29, necessitating a continuance of the trial. On May 9, 1983, the trial court, the Honorable Larry M. Hatch, declared a mistrial and ordered that the jury be discharged on grounds the time lag involved would be detrimental to the jury and the parties. It is presumed that Mr. Chapman's allusion to a prior trial is in reference to the proceedings had on March 29, 1983.

■ Myron's offer of proof could certainly have been more definite; however, it does at least refer to testimony earlier elicited during trial. We are referred to the following testimony of Mathilda Moen, Martha's sister, as indicative of the type of testimony which Myron attempted to present before the trial court:

"Q. Okay. In your testimony you responded to one of my questions, Mrs. Moen, you talked about pressure regarding this transaction in June of 1975. Could you explain to us what kind of pressure was put on her?

"A. It was something to do with the land. I recall that Milton and. Clifford were putting pressure on Martha to give Clifford these three quarters of land. I really don't remember too much about it, but it was some deal with Milton for her to make a will."

A further examination of the trial transcript reveals, however, additional testimony which clarifies Mrs. Moen's statement concerning Martha's "deal with Milton for her to make a will":

"Q. Did she · [Martha] mention the fact that Clifford was putting pressure on her in June of '75?

"A. Yes.

"Q. What did he say to her?

"A. Just about this land deal with Milton. I don't know if it was '75 or what year it was, but it seems to me that was the year. Well, anyhow, if she gave Clifford this three quarters of land, then Milton would set Clifford up in farming.

"Q. Okay. Now what about as far as the will is concerned?

"A. She just said that she made a will giving it all to Clifford, but she said, 'I am going to change the will.'

"Q. But then was there some sort of deal or transaction regarding the will?

"A. That's when her and Myron had come to the house and she said she was going to make a new will. Sometime after that Martha told me she had called Myron and said he should be real happy. And I said, 'Why is this?' And she said, 'I just got through talking to him and

told him I had made a new will.' She said, 'Clifford got the land, so I will give him the rest of the stuff.' Now that's all I know, whether it was done or not I don't know.

\* \* \* \* \* \*

"Q. Mrs. Moen, if I understood your testimony, there were sort of two different transactions, one transferring some land to Clifford and the other one a will; is that correct?

"A. Yes.

"Q. And if I understood your testimony, Milton was proposing to Martha, her former husband and the father of Clifford and Myron, he was proposing that if Martha would give Clifford the three quarters of land he would do the same thing; is that right?

"A. That's correct.

"Q. And that's the kind of pressure that you were talking about, wasn't it?

"A. Yes.

"Q. And you don't know of any other kind of pressure being put on her, do you?

"A. No, I don't know of any other kind of pressure."

Mr. Weikum's testimony concerning discussions had with Martha and Myron in 1977 also reveals the possibility that the various deeds were interrelated:

"A. She [Martha] mentioned something ..., that there was some kind of discussion concerning her needing to provide some land in order for her son to be able to obtain some other land from his father."

The above testimony, at best, may tend to prove that there existed an understanding between Milton and Martha concerning the conveyance of land by deed to Clifford which would enable Clifford to farm. Mrs. Moen's testimony indicates that Martha may have considered *changing* her will; however, we do not believe such evidence tends to prove that undue influence was exercised over Martha in the *execution* of her will. There being no offer of proof outlining additional proposed

testimony from Mrs. Moen, Mr. Weikum or others concerning the relevancy of the deeds dated April 25, 1975, we conclude that the trial court could reasonably have determined that the deeds and proposed testimony, relative to their "tie-in" with Martha's will, were irrelevant to the issue in this case.

The judgment is affirmed.

VANDE WALLE, PEDERSON, GIERKE and SAND, JJ., concur.