Gene LASATER and Carolyn Lasater,
Appellants–Plaintiffs,

v.

Donald HOUSE, Sr., as Personal Representative of the Estate of Opal M. Pullen, Deceased, et al., Appellees–Defendants.

No. 18A04–0305–CV–223.

Court of Appeals of Indiana.

March 30, 2004.

Donald K. McClellan, McClellan, McClellan & Arnold, Muncie, IN, Attorney for Appellants.

P. Gregory Cross, The Cross Law Firm, Muncie, IN, Attorney for Appellees.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

Gene and Carolyn Lasater filed their "Amended Complaint to Contest the Last Will and Testament of Opal M. Pullen and Void the Transfer of Non–Probate Bank Accounts" against Donald House, Sr., personally and as personal representative of Opal Pullen's estate, Mabel Dunn, Pricilla Studebaker, Gaston United Methodist Church, Masonic Lodge # 650, Theodore Coffman, Mutual Federal Savings Bank as trustee for Billy Dunn, and Judy Clemens (collectively "the Estate"). The Lasaters allege in their complaint that Pullen's will was the product of undue influence. Prior to trial, the Lasaters moved the court to rule on the admissibility of witness testimony regarding certain statements Pullen had made around the time she executed her will. And the Estate moved the court to exclude the opinions of the Lasaters' two expert witnesses. The trial court ruled in favor of the Estate on both motions. The Lasaters bring this interlocutory appeal challenging those rulings. They present the following issues for our review:

1. Whether Pullen's declarations made both before and after she executed her will are admissible under Indiana Rule of Evidence 803(3) to show her state of mind at the time she executed her will.

2. Whether the trial court abused its discretion when it excluded the Lasaters' expert witnesses' testimony.

We affirm in part, reverse in part, and

remand.[1]

## FACTS AND PROCEDURAL HISTORY

In 1994, Pullen, a widow with no children, executed a last will and testament. Under that will, she gave $2,000 each to five family members, including nephew Donald House, and $1,000 each to two charitable organizations. Pullen devised the residue of her estate, which included a 120–acre farm, to her neighbors the Lasaters. At that time, Pullen also executed a general power of attorney naming David A. Vannatter, a local banker and family friend, as her attorney-in-fact. Pullen's testamentary documents were prepared by Attorney William Bales, Jr.

On January 30, 1998, Pullen revoked Vannatter's power of attorney.[2] Around that time, House became involved in Pullen's affairs and arranged a meeting between her and Attorney Wayne Lennington. On February 8, 1998, Pullen, with the assistance of Lennington, appointed House as her attorney-in-fact. Thereafter, on February 21, in the presence of Lennington and House, Pullen executed a second last will and testament that revoked her first will. Under the second will, Pullen left her charitable bequests intact, but increased her bequests to family members at the expense of the Lasaters. Although Pullen left the Lasaters half of her farm, she left House, along with three other family members, $20,000 each and the residue of her estate, which included the other half of the farm. The will also named House as personal representative of Pullen's estate.

Pullen died on January 2, 2001, at the age of ninety-one. Thereafter, her last will and testament was admitted to probate, and, pursuant to the will, House was appointed as personal representative. On February 21, 2001, the Lasaters filed their complaint and alleged that Pullen's second will was void because it was the product of House's undue influence. A jury trial was scheduled for November 12, 2002.

During discovery, several witnesses gave testimony regarding statements Pullen had made about her relationships with the Lasaters and House and about her estate plan. The Lasaters also deposed two expert witnesses, William Fatout, a probate attorney, and Dr. Thomas Murray, a licensed psychologist. Based on their review of Pullen's estate plan and the witness depositions that the Lasaters had provided to them, both Fatout and Dr. Murray testified in their depositions that they believed that House exercised undue influence over Pullen at the time she executed the second will.

A few weeks prior to the scheduled trial date, the Estate filed a motion in limine to exclude hearsay evidence of Pullen's statements and a motion to preclude Fatout and Dr. Murray's testimony. After a hearing,[3] the trial court indicated that it "preliminarily intend[ed] to grant in whole or in part" the Estate's motions.

In response, the Lasaters moved the court to "reconsider granting [the Estate's] motion in limine concerning hearsay evidence upon undue influence filed." The court denied that motion. The Estate then moved for a change of judge, which the trial court granted. In February 2003, the new judge accepted jurisdiction. The

---

1.  We deny the Estate's request for oral argument.

2.  It is unclear from the record which attorney prepared the revocation.

3.  Neither party requested that a transcript of the hearing be prepared for this appeal.

Lasaters requested a second hearing on the admissibility of Pullen's statements and Fatout and Dr. Murray's testimony. On March 20, 2003, the trial court entered two orders excluding the proffered hearsay evidence and expert testimony. Specifically, the trial court ruled that the hearsay statements were inadmissible under Indiana law and that the expert testimony was unreliable and did not meet the criteria of admissibility under Indiana Rules of Evidence 702 and 704.

The Lasaters filed a petition with the trial court requesting certification of those orders for interlocutory appeal. The trial court granted the petition and agreed to stay matters pending resolution of the appeal. The Lasaters then moved this court to accept jurisdiction over their interlocutory appeal, which this court granted. This appeal ensued.

## DISCUSSION AND DECISION

### Issue One: Pullen's Hearsay Statements

The Lasaters contend that Pullen's hearsay statements are admissible under Indiana Evidence Rule 803(3) as evidence of her state of mind at the time she executed the second will. The Estate, on the other hand, contends that those hearsay statements should be excluded because Indiana law has traditionally excluded a testator's statements which were not made at the time of the will's execution.

■ As an initial matter, the parties disagree on the appropriate standard of review. The Estate contends that an abuse of discretion standard applies, while the Lasaters contend that our review is de novo. Generally, a trial court's evidentiary rulings are reviewed for an abuse of discretion because those rulings are predicated on factual findings that are entitled to deference on appeal. *See Stahl v. State,* 686 N.E.2d 89, 91 (Ind.1997). However, where, as here, a trial court's evidentiary ruling involves the interpretation of a rule of evidence, which is a question of law, we apply a de novo standard of review. *See id.*

■ The following hearsay statements[4] are at issue: (1) Pullen's former insurance agent, Larry Fenstermaker, stated that Pullen told him that she had a nephew, but that she did not "want him to have anything;" (2) Angela Stocker, a former caretaker of Pullen's, stated that Pullen had told her that she was good friends with the Lasaters, but that she was never close to House until she signed the power of attorney and that it was House's idea to give a family member her power of attorney; (3) Rita Clock, another former caretaker of Pullen's, stated that the Lasaters were her longtime friends; (4) David Vannatter, Pullen's former attorney-in-fact stated that Pullen had told him, prior to revoking his power of attorney and executing a new will, that she was afraid of House and that she was going to have to change her power of attorney to keep peace in the family; (5) Pullen's former hairdresser, Julie Herron, stated that Pullen had always said that the Lasaters would be heirs to her farm and her house; she also testified that Pullen had said that she changed her will against her wishes because "[House is] family."[5]

Hearsay is a statement, other than one made by the declarant while testifying at

4. In its order excluding Pullen's statements, the trial court listed page numbers from various witnesses' depositions and concluded that "such evidence upon the issue of undue influence of the testator . . . is not admissible. . . ." Rather than addressing each of the statements contained on those listed pages, we limit our discussion to the specific hearsay statements that the Lasaters have delineated in their brief on appeal.

5. The Lasaters also seek to admit their own testimony regarding statements made by Pul-

the trial or hearing, offered in evidence to prove the truth of the matter asserted. Ind. Evidence Rule 801(c). Hearsay is inadmissible unless admitted pursuant to a recognized exception. Evid. R. 802. The Lasaters concede that Pullen's statements are hearsay, but they contend that those statements are admissible under the state of mind exception to the hearsay rule, which provides in relevant part:

> The following are not excluded by the hearsay rule . . .
>
> * * *
>
> ▪ (3) Then Existing Mental, Emotional, or Physical Condition. A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain and bodily health), but not including a statement .of memory or belief to prove the fact remembered or believed unless it related to the execution, revocation, identification, or terms of declarant's will.

Ind. R. Evid. 803(3). In particular, the Lasaters contend that Pullen's statements are admissible under Rule 803(3) because Indiana courts have admitted similar types of statements under that exception in other cases.[6]

For instance, in criminal cases, our supreme court has held that a victim's state-

len. However, we conclude that their testimony is inadmissible under the Dead Man's Statute. That statute provides, in relevant part, as follows:

> (a) This section applies to suits or proceedings:
> (1) in which an executor or administrator is a party;
> (2) involving matters that occurred during the lifetime of the decedent; and
> (3) where a judgment or allowance may be made or rendered for or against the estate represented by the executor or administrator.
> (b) . . . [A] person:
> (1) who is a necessary party to the issue or record; and
> (2) whose interest is adverse to the estate;
> is not a competent witness as to matters against the estate.

Ind.Code § 34–45–2–4. " 'Party' as used in the statute means the witness must be a party to the issue, or if merely a party to the record then to be incompetent the witness must have an interest in the issue in favor of the party calling him and adverse to the estate." *Satterthwaite v. Satterthwaite's Estate*, 420 N.E.2d 287, 290 (Ind.Ct.App.1981). An interest which would render a witness incompetent is one by which the witness will gain or lose by the direct legal operation of that judgment. *Id.* The interest must be direct, present, certain and vested. *Id.* It must be a real and legal interest. *Id.* A bias or sentiment is not sufficient to cause a witness to be incom-

petent. *Id.* The interest of the witness must be adverse to the estate. *Id.* Here, the Dead Man's Statute renders the Lasaters' testimony incompetent because as the named plaintiffs, the Lasaters are parties of record, and they are parties of interest because, as beneficiaries under both of Pullen's wills, they stand to gain or lose depending on which will is declared valid. None of the other witnesses are precluded from testifying under the Dead Man's Statute because they are not parties to the issue, nor are they beneficiaries under either of the wills.

6. Neither party addresses the express will exception contained within the rule. Under Rule 803(3), a declaration of intent to do an act is admissible as proof that the act was done. In contrast, a statement of memory or belief cannot be admitted as proof that the fact remembered or believed did happen unless it pertains to the "execution, revocation, identification, or terms" of a declarant's will. Ind. R. Evid. 803(3). An exception is made for a testator's statements of memory or belief because the testator, now unavailable, is the person "who best knew the facts and often was the only person with that knowledge." 2 MCCORMICK ON EVIDENCE § 276, at 228 (John W. Strong, ed., 5th ed.1999). Thus, Pullen's statements made *after* she executed her will, while admissible to show her state of mind, may also be admissible to prove a fact remembered or believed, so long as those statements specifically pertain to the execution, revocation, or terms of her will.

ments expressing her feelings about her relationship with a defendant may be admitted into evidence, provided the victim's state of mind is at issue. *See Vehorn v. State*, 717 N.E.2d 869, 874 (Ind.1999) (holding admissible murder victim's statement that she and defendant had a stormy relationship, which she had tried to terminate); *Pierce v. State*, 705 N.E.2d 173, 176 (Ind.1998) (holding admissible victim's statements that defendant was "mad" at her and was "not talking" to her as evidence they were not getting along at time of murder); *Ford v. State*, 704 N.E.2d 457, 459–60 (Ind.1998) (holding admissible victim's statements that she was unhappy with defendant but afraid to leave him for fear he would kill her, because such statements controverted defendant's assertion victim acted aggressively towards him at time of murder); *Taylor v. State*, 659 N.E.2d 535, 542–543 (Ind.1995) (holding admissible murder victim's statement that "she was scared to tell" as reason she waited significant period of time before accusing defendant of sexual assault); *see also* GLEN WEISSENBERGER, WEISSENBERGER'S INDIANA EVIDENCE 2004 COURTROOM MANUAL 311 (2003) (providing examples of statements generally satisfying the requirements of 803(3), such as "I am afraid," "I like Nor[m]," and "I am happy.").

Here, like the statements enumerated above, the proffered statements reflect Pullen's state of mind as contemplated by Rule 803(3) because they demonstrate how she felt about the Lasaters and House. Specifically, Pullen's statements indicate that she was fond of the Lasaters, but that she regarded House with fear and anxiety. Further, Pullen's statements are relevant because her state of mind is at issue in this case. As we explained in *Love v. Harris*, 127 Ind.App. 505, 143 N.E.2d 450, 453 (1957), " '[u]ndue influence

necessarily involves a state of mind ... [and it] may be brought about by mental or physical coercion, fear, a desire for peace, or a feeling which one is unable to resist.' " *Id.* (quoting *Workman v. Workman*, 113 Ind.App. 245, 46 N.E.2d 718, 726 (1943)). More recently, we defined undue influence as " 'the exercise of sufficient control over the person, the validity of whose act is brought into question, to destroy his free agency and constrain him to do what he would not have done if such control had not been exercised.' " *In re Estate of Wade*, 768 N.E.2d 957, 962 (Ind. Ct.App.2002) (quoting *Crider v. Crider*, 635 N.E.2d 204, 210 (Ind.Ct.App.1994)), *trans. denied.*

The law of other jurisdictions also provides useful guidance on this issue. The Lasaters direct us to decisions from other states where testators' statements were admitted under Rule 803(3) as evidence of their state of mind at the time of will execution. *See Okken v. Okken Estate*, 348 N.W.2d 447, 451 (N.D.1984) (admitting evidence of testator's ill-will towards son over seventeen-year period as evidence of her state of mind and feelings toward son at time will executed, making it more probable she was *not* under undue influence when she excluded him from will); *see also Knesek v. Witte*, 754 S.W.2d 814, 818 (Tex. Ct.App.1988) (holding testator's statements about oral agreement to make reciprocal wills admissible as declarations of his "state of mind" and "fact remembered or believed" relating to will); *Honey v. Hickey*, 26 Ark.App. 99, 760 S.W.2d 81, 82 (1988) (holding similar testimony admissible under hearsay exception).

Likewise, Pullen's statements about her relationships with the Lasaters and House tend to prove her state of mind and her feelings towards them. Given that Pullen changed her will to materially favor House, her statements make it more prob-

able that House's actions affected Pullen's judgment at the time she executed her will. Because we have previously admitted the type of statements sought to be admitted here under Rule 803(3), namely statements about a declarant's feelings towards other people, and because other jurisdictions have admitted testators' statements to show state of mind at the time of will execution, we conclude that Pullen's statements are admissible to show her feelings about the Lasaters and House at the time she executed her second will.

Still, the Estate contends that Pullen's statements should be excluded because Indiana common law has traditionally held that "mere declarations of a testator, not made contemporaneously with the execution of a will, are not admissible for the purpose of showing that the will was procured by undue influence." *Hayes v. West*, 37 Ind. 21, 23 (1871). The Estate asserts that Rule 803(3) does not conflict with that common law rule as applied to the statements at issue here because of the "non-contemporaneous nature of [Pullen's excluded] statements." The Estate essentially maintains that no conflict exists between the two rules because statements under Rule 803(3) must reflect a then-existing state of mind, and since the Lasaters are seeking to prove Pullen's state of mind at the time she executed the will, only the statements that Pullen made at the time of the will execution are admissible. We disagree that the timing of Pullen's statements necessarily precludes their admissibility under Rule 803(3).

While Rule 803(3) requires a declarant's statements to reflect a then-existing state of mind, those statements may be used to make inferences about the declarant's state of mind both before and after the statements were made. As one scholar has observed:

Although the statement must describe a state of mind or feeling existing at the time of the statement, the evidentiary effect of the statement is broadened by the notion of the continuity in time of states of mind. For example, if a declarant asserts on Tuesday a then-existing intention to go on a business trip the next day, this will be evidence not only of the intention at the time of the statement, but also of the same purpose the next day when the declarant is on the road. Continuity may also look backwards. Thus, when there is evidence that a will has been mutilated by the maker, the declarant's subsequent statements of a purpose inconsistent with the will are received to show his or her intent to revoke it at the time it was mutilated.

2 McCormick on Evidence § 274, 219 (John W. Strong, ed., 5th ed.) (footnotes omitted).

Consistent with that approach, Indiana courts have held that a victim's statements concerning her state of mind prior to and after a crime may be admissible, where relevant, to show her state of mind at the time of the crime. *See McGrew v. State*, 673 N.E.2d 787, 794–95 (Ind.Ct.App.1996) (holding victim's statements made after crime not per se inadmissible to show state of mind at time of crime), *aff'd in relevant part*, 682 N.E.2d 1289 (Ind.1997); *Ford*, 704 N.E.2d at 460; *Pierce*, 705 N.E.2d at 176. In addition, in *Okken*, 348 N.W.2d at 451, the North Dakota Supreme Court held that seventeen-year-old evidence of ill-will between a testator and her son was not too remote to show the testator's state of mind at the time she executed her will where that evidence was combined with more recent evidence that established a distinct pattern of hostility. Based on the foregoing, we conclude that Pullen's statements made both before and after the execution of the will may be used as evi-

dence of her state of mind at the time she executed the second will.

Because Pullen's statements satisfy the requirements of Rule 803(3), the Estate's reliance on the common law is misplaced. The Indiana Rules of Evidence were adopted by the Indiana Supreme Court on August 24, 1993, and became effective on January 1, 1994. Evidence Rule 101 provides as follows:

> (a) General Applicability. These rules apply in all proceedings in the courts of the State of Indiana except as otherwise required by the Constitution of the United States or Indiana, by the provisions of this rule, or by other rules promulgated by the Indiana Supreme Court. *If these rules do not cover a specific evidence issue, common or statutory law shall apply.*

(Emphasis added). In other words, "[If the evidence rules] provide an answer, all other sources, whether statutory or earlier case law, are to be disregarded." 12 ROBERT LOWELL MILLER, JR., INDIANA PRACTICE § 102.101 (2d ed.1995).[7]

Finally, the Estate asserts that Pullen's statements are inadmissible because "the outcome of [will] contests such as the present one could be determined by competition between opposing accumulations of unsworn declarations, and the unbridled speculation of the trier of fact in trying to interpret them." But, in general, a declarant's statements reflecting her then-existing state of mind are considered to be both reliable and helpful. Such statements are considered especially reliable because they are made spontaneously, and are therefore probably sincere. *See* 2 MCCORMICK ON EVIDENCE § 274, 217 (John W. Strong, ed., 5th ed.). Further, the statements are helpful because "[o]ften no better way exists to prove a relevant mental or physical condition than through the statements of the individual whose condition is at issue." *Id.* This is especially true in cases of undue influence, such as the one here, where most of the evidence available to prove such a claim will be circumstantial. In *McCartney v. Rex*, 127 Ind.App. 702, 145 N.E.2d 400, 402 (1957), we quoted with approval the following excerpt from a Colorado Court of Appeals decision:

> It follows from the very nature of the thing that evidence to show undue influence must be largely in effect circumstantial. It is an intangible thing which only in the rarest instances is susceptible of what may be termed direct or positive proof. The difficulty is also enhanced by the fact universally recognized that he who seeks to use undue influence does so in privacy. He seldom uses brute force or open threats to terrorize his intended victim, and if he does he is careful that no witnesses are about to take note of and testify to the fact.

---

7. Although we need not look to the common law, we disagree with the Estate's contention that the common law requires exclusion of Pullen's statements for the purposes sought to be admitted here, namely as evidence of her state of mind. The Estate directs us to passages from secondary sources in support of its contention that the prevailing rule in Indiana, as well other jurisdictions, is that a testator's statements not made contemporaneously with the execution of the will are inadmissible to prove undue influence. But our review of those sources indicates that a testator's declarations are admissible as evidence of the testator's state of mind. *See* 29 INDIANA LAW ENCYCLOPEDIA, *Wills* § 37 (2003) ("[A testator's declarations] may be admitted to prove or disprove the testator's weakness of mind and consequent susceptibility to undue influence, or his feelings and attitude toward, and relations with, persons mentioned in, or excluded from, his will." (footnotes omitted)); 79 AM. JUR.2D *Wills* § 434, 557 (2002) ("[I]t is the rule that the testator's declarations are admissible where undue influence is in issue to show his state of mind and susceptibility to undue influence....").

He observes, too, the same precautions if he seeks by cajolery, flattery or other methods to obtain power and control over the will of another and direct it improperly to the accomplishment of the purpose which he desires.

(Quoting *Blackman v. Edsall,* 17 Colo.App. 429, 68 P. 790 (1902)).

While the sequence of events that led Pullen to change her power of attorney and her will may give rise to an inference of undue influence, no better evidence exists as to how Pullen felt about the Lasaters and House than the statements that Pullen made during the relevant time period. In sum, we hold that the trial court erred when it excluded the hearsay statements at issue. Because those statements are relevant to Pullen's state of mind at the time she executed her second will, they are admissible under Rule 803(3).[8]

**Issue Two: Expert Testimony**

Next, the Lasaters contend that the trial court abused its discretion when it excluded the expert testimony of attorney William Fatout and psychologist Thomas Murray. In its order, the trial court ruled that "The opinions expected to be offered by witnesses William Fatout and Thomas Murray do not meet the criteria of admissibility under Rules 702 [9] and 704 [10] of the Indiana Rules of Evidence, nor are the same reliable."

■ The trial court is considered the gatekeeper for expert opinion evidence. *Clark v. Sporre,* 777 N.E.2d 1166, 1170 (Ind.Ct.App.2002). In other words, the trial court's function is to control the admission of proffered expert testimony rather than merely admitting whatever is offered and leaving it to the jury to determine what weight it should be given. *State Dep't of Transp. v. Hoffman,* 721 N.E.2d 356, 359 (Ind.Ct.App.1999). To fulfill this function, it is entrusted with the discretion to rule on the admissibility of expert opinion evidence. *Clark,* 777 N.E.2d at 1170. The trial court's exclusion or admission of expert testimony will be reversed only for abuse of that discretion. *Id.* An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court, or if the court has misinterpreted the law. *Johnson v. Eldridge,* 799 N.E.2d 29, 33 (Ind.Ct.App. 2003), *trans. denied.*

■ Here, the Lasaters did not include either their memorandum in opposition to the Estate's motion to preclude the expert testimony or a transcript of the hearing on that motion in the record on appeal. As such, we have no way of knowing what arguments they presented to the trial court on this issue, and, therefore, we cannot determine whether the trial court

8. Our holding is limited to the statements' admissibility under 803(3) and does not preclude the Estate from raising other evidentiary challenges to those statements.

9. Evidence Rule 702 provides as follows:
(a) If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
(b) Expert scientific testimony is admissible only if the court is satisfied that the scienti-

fic principles upon which the expert testimony rests are reliable.

10. Evidence Rule 704 provides as follows:
(a) Testimony in the form of an opinion or inference otherwise admissible is not objectionable merely because it embraces an ultimate issue to be decided by the trier of fact. (b) Witnesses may not testify to opinions concerning intent, guilt, or innocence in a criminal case; the truth or falsity of allegations; whether a witness has testified truthfully; or legal conclusions.

abused its discretion in precluding the experts' testimony. *See, e.g., Roach v. State*, 695 N.E.2d 934, 939 (Ind.1998) (reiterating necessity of offer to prove where challenging excluded testimony; offer must reveal the substance of the evidence, grounds for admission, and relevance of testimony).[11] The issue is therefore waived. *See* Ind. Appellate Rule 50(A)(2)(d) and (f).

■ Waiver notwithstanding, the parties' briefs on appeal suggest that the primary issue disputed by the parties and which underlies the trial court's ruling was the admissibility of the experts' testimony that House had exerted undue influence on Pullen. Fatout stated that "undue influence was likely under the facts" as he understood them. And Dr. Murray stated that "there was some undue influence that was imposed by [House] on [Pullen]." The Estate contends that those opinions constitute inadmissible legal conclusions.

■ "A legal conclusion is where an expert states his opinion as to how the case should be decided." *City of Columbia City v. Indiana Util. Regulatory Comm'n*, 618 N.E.2d 21, 28 (Ind.Ct.App. 1993) (holding expert's identification of relevant factors for regulatory commission to consider in ruling on petition did not constitute legal conclusion because expert did not testify as to "who should win") (citing McCORMICK ON EVIDENCE § 12 (1972)). Expert witnesses are prohibited from giving their opinions on matters concerning legal conclusions because: (1) legal conclusions are not helpful to the trier of fact; (2) legal conclusions are reserved solely for the court's determination; and (3) it is the function of the court, not the expert witness, to instruct on the law. *See* 13 ROBERT LOWELL MILLER, JR., INDIANA PRACTICE, INDIANA EVIDENCE § 704.206, 460 (2d ed.1995); *Vaughn v. Daniels Co. (West Virginia), Inc.*, 777 N.E.2d 1110, 1122-23 (Ind.Ct.App.2002). In *Vaughn*, we held that although there has been a "'trend ... to allow expert opinion testimony even on the ultimate issue of the case, so long as the testimony concerns matters which are not within the common knowledge and experience of ordinary persons and will aid' the trier of fact," experts should not be permitted to offer legal conclusions as part of their testimony because to do so would violate the spirit of Rule 704(b). *See* 777 N.E.2d at 1119–20, 1122 (citation omitted) (holding expert's opinion contained impermissible legal conclusions about defendant's construction design where expert concluded that: defendant failed to use "reasonable care" in making design; design was "unreasonably dangerous;" and design "proximately caused" plaintiff's injuries).

Likewise, under Federal Rule of Evidence 704,[12] legal opinions which "merely tell the jury what result to reach" or are "phrased in terms of inadequately explored legal criteria" are inadmissible. *See* 29 CHARLES ALAN WRIGHT & VICTOR JAMES GOLD, FEDERAL PRACTICE AND PROCE-

---

**11.** While an offer to prove is only required during trial, the principles underlying the necessity of an offer to prove apply where, as here, we are asked to review the trial court's exclusion of the expert testimony prior to trial. For instance, we do not know whether the Lasaters presented the same arguments to the trial court as they present to this court on appeal, and a party is limited to the specific grounds argued to the trial court and cannot assert new bases for admissibility for the first time on appeal. *Taylor v. State*, 710 N.E.2d 921, 923 (Ind.1999).

**12.** Although the federal counterpart to Evidence Rule 704 does not contain the same prohibition on legal conclusions, federal courts exclude legal opinions for the same reasons that we do, namely, because those opinions are not helpful to the trier of fact and invade the province of the trial court. *See* Fed.R.Evid. 701, 702.

DURE 361 (1997). Thus, the question, "Did [the testator] have [the] capacity to make a will?" would be excluded, while the question, "Did [the testator] have sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution?" would be admitted. *Id.* Federal courts have developed the following test to distinguish between opinions containing admissible facts and those containing inadmissible legal conclusions: if the terms used by the witness have a separate, distinct, and specialized meaning in the law different from that present in the vernacular, exclusion is appropriate. *See Torres v. County of Oakland,* 758 F.2d 147, 151 (6th Cir.1985).

" 'The phrase "undue influence" when used in connection with the execution of wills and deeds, ha[s] a legal meaning, which is often [the] subject of debate among those learned in the law, and hence it could not be expected that … a jury would understand what was meant by its use in such connection.' " *Love,* 143 N.E.2d at 457 (quoting *Gwinn v. Hobbs,* 72 Ind.App. 439, 118 N.E. 155, 162 (1917)). In fact, in this case, Dr. Murray had to be instructed by Fatout on the meaning of undue influence before he could render an opinion on the issue. As Dr. Murray stated, "[Fatout's materials were] helpful to me in the sense that I needed to know what the *legal definition* was of undue influence." (Emphasis added). He went on to state that he "couldn't have given … that definition if someone had asked [him] to spell it out." We conclude that the trial court properly excluded Fatout and Dr. Murray's opinions that House exerted undue influence over Pullen.[13]

---

13. Our review of the experts' depositions indicates that they might have offered relevant opinions other than merely stating the prohibited legal conclusion discussed above. But, again, the Lasaters have not provided us with any means of determining what arguments they presented to the trial court. Thus, we cannot make any determination on appeal regarding the admissibility of those other opinions that might be offered at trial.

Affirmed in part, reversed in part, and remanded.

BAKER, J., and MAY, J., concur.